THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEVEN O'NEIL *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 1—85—1853 through 1—85—1855, 1—85—1952, 1—85—1953 cons.

Opinion filed January 19, 1990.

John Powers Crowley and Robert M. Stephenson, both of Cotsirilos & Crowley, Ltd., of Chicago, for appellants Steven O'Neil, Film Recovery Systems, Inc., and Metallic Marketing Systems, Inc.

Elliott M. Samuels, of Chicago, for appellant Charles Kirschbaum.

Sam Adam, of Chicago, for appellant Daniel Rodriguez.

Cecil A. Partee, State's Attorney, of Chicago (Peter D. Fischer, Jay C. Magnuson, and Frank J. Parkerson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a joint bench trial, individual defendants Steven O'Neil, Charles Kirschbaum, and Daniel Rodriguez, agents of Film Recovery

Systems, Inc. (Film Recovery), were convicted of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(2)) in the death of Stefan Golab, a Film Recovery employee, from cyanide poisoning stemming from conditions in Film Recovery's plant in Elk Grove Village, Illinois. Corporate defendants Film Recovery and its sister corporation Metallic Marketing Systems, Inc. (Metallic Marketing), were convicted of involuntary manslaughter (Ill. Rev. Stat. 1981, ch. 38, par. 9—3(a)) in the same death. O'Neil, Kirschbaum, Rodriguez, Film Recovery, and Metallic Marketing were also convicted of 14 counts of reckless conduct (Ill. Rev. Stat. 1981, ch. 38, par. 12—5(a)) involving 14 other Film Recovery employees.[1]

We note here that Gerald Pett and Michael T. Mackay were indicted with the other individual defendants for murder and reckless conduct. B.R. Mackay & Sons, Inc., owned by Mackay, was indicted with the other corporate defendants for involuntary manslaughter. Pett was tried for murder and reckless conduct but was acquitted of all charges. Mackay and B.R. Mackay & Sons, Inc., could not be extradited from Utah and were not tried.

Individual defendants O'Neil, Kirschbaum, and Rodriguez each received sentences of 25 years' imprisonment for murder and 14 concurrent 364-day imprisonment terms for reckless conduct. O'Neil and Kirschbaum were also each fined $10,000 with respect to the murder convictions and $14,000 with respect to the convictions for reckless conduct. Corporate defendants Film Recovery and Metallic Marketing were each fined $10,000 with respect to the convictions for involuntary manslaughter and $14,000 with respect to the convictions for reckless conduct.

On appeal, defendants urge that their convictions must be reversed and the cause remanded for retrial because the judgments rendered were inconsistent. Defendants also contend that the evidence presented at trial was insufficient to support the convictions.

We conclude that the judgments rendered are legally inconsistent. Therefore, we now reverse those convictions as to both the individual and corporate defendants and remand the matter for retrial. We summarize below those facts, as they appear in the record, which are pertinent to our disposition.

In 1982, Film Recovery occupied premises at 1855 and 1875 Greenleaf Avenue in Elk Grove Village. Film Recovery was there engaged in the business of extracting, for resale, silver from used X-ray

---

[1]Reckless conduct charges as to six other Film Recovery employees were dismissed by the State at the close of its case in chief.

and photographic film. Metallic Marketing operated out of the same premises on Greenleaf Avenue and owned 50% of the stock of Film Recovery. The recovery process was performed at Film Recovery's plant located at the 1855 address and involved "chipping" the film product and soaking the granulated pieces in large, open, bubbling vats containing a solution of water and sodium cyanide. The cyanide solution caused silver contained in the film to be released. A continuous flow system pumped the silver-laden solution into polyurethane tanks which contained electrically charged stainless steel plates to which the separated silver adhered. The plates were removed from the tanks to another room where the accumulated silver was scraped off. The remaining solution was pumped out of the tanks and the granulated film, devoid of silver, shovelled out.

On the morning of February 10, 1983, shortly after he disconnected a pump on one of the tanks and began to stir the contents of the tank with a rake, Stefan Golab became dizzy and faint. He left the production area to go rest in the lunchroom area of the plant. Plant workers present on that day testified Golab's body had trembled and he had foamed at the mouth. Golab eventually lost consciousness and was taken outside of the plant. Paramedics summoned to the plant were unable to revive him. Golab was pronounced dead upon arrival at Alexian Brothers Hospital.

The Cook County medical examiner performed an autopsy on Golab the following day. Although the medical examiner initially indicated Golab could have died from cardiac arrest, he reserved final determination of death pending examination of results of toxicological laboratory tests on Golab's blood and other body specimens. After receiving the toxicological report, the medical examiner determined Golab died from acute cyanide poisoning through the inhalation of cyanide fumes in the plant air.

Defendants were subsequently indicted by a Cook County grand jury. The grand jury charged defendants O'Neil, Kirschbaum, Rodriguez, Pett, and Mackay with murder, stating that, as individuals and as officers and high managerial agents of Film Recovery, they had, on February 10, 1983, knowingly created a strong probability of Golab's death. Generally, the indictment stated the individual defendants failed to disclose to Golab that he was working with substances containing cyanide and failed to advise him about, train him to anticipate, and provide adequate equipment to protect him from attendant dangers involved. The grand jury charged Film Recovery and Metallic Marketing with involuntary manslaughter stating that, through the reckless acts of their officers, directors, agents, and oth-

ers, all acting within the scope of their employment, the corporate entities had, on February 10, 1983, unintentionally killed Golab.[2] Finally, the grand jury charged both individual and corporate defendants with reckless conduct as to 20 other Film Recovery employees based on the same conduct alleged in the murder indictment, but expanding the time of that conduct to "on or about March 1982 through March 1983."

Proceedings commenced in the circuit court in January 1985 and continued through the conclusion of trial in June of that year. In the course of the 24-day trial, evidence from 59 witnesses was presented, either directly or through stipulation of the parties. That testimony is contained in over 2,300 pages of trial transcript. The parties also presented numerous exhibits including photographs, corporate documents and correspondence, as well as physical evidence.

On June 14, 1985, the trial judge pronounced his judgment of defendants' guilt. The trial judge found that "the mind and mental state of a corporation is the mind and mental state of the directors, officers and high managerial personnel because they act on behalf of the corporation for both the benefit of the corporation and for themselves." Further, "if the corporation's officers, directors and high managerial personnel act within the scope of their corporate responsibilities and employment for their benefit and for the benefit of the profits of the corporation, the corporation must be held liable for what occurred in the work place."

Defendants filed timely notices of appeal, the matters were consolidated for review, and arguments were had before this court in July 1987. One of defendants' principal contentions was that the Federal Occupational Safety and Health Act of 1970 (OSHA) (29 U.S.C. §651 et seq. (1982)) preempted State criminal prosecutions against individual and corporate defendants for conditions in an industrial workplace. That identical issue was the subject of a then pending appeal before the Illinois Supreme Court in People v. Chicago Magnet Wire Corp. (1989), 126 Ill. 2d 356, 534 N.E.2d 962. Accordingly, we postponed disposition in this case until the supreme court decided Chicago Magnet Wire. Following the determination in Chicago Magnet Wire that such prosecutions were not preempted under OSHA, we invited the parties to file new briefs and scheduled further oral argument on the remaining issues.

---

[2]To avoid confusion, we have omitted reference to the name of B.R. Mackay & Sons, Inc., in the involuntary manslaughter indictment.

84

Defendants raise two contentions with respect to the consistency of the judgments rendered at trial. Each contention rests, ultimately, on the observation that the offense of murder requires a mental state different from that required for the offenses of involuntary manslaughter and reckless conduct.

In their first contention, defendants argue that the judgments for murder and reckless conduct against individual defendants O'Neil, Kirschbaum, and Rodriguez are inconsistent because, while the offense of murder requires a knowing and intentional act (see Ill. Rev. Stat. 1981, ch. 38, pars. 4—5, 9—1(a)), reckless conduct does not (see Ill. Rev. Stat. 1981, ch. 38, pars. 4—6, 12—5(a)). Defendants argue both convictions, however, arose from the same acts of the individual defendants. Defendants reason O'Neil, Kirschbaum, and Rodriguez could not be responsible for intentional and unintentional conduct at the same time and, therefore, the judgments for murder and reckless conduct against them are inconsistent.

Defendants rely on the same logic to support the contention that the murder convictions against individual defendants O'Neil, Kirschbaum, and Rodriguez are inconsistent with the convictions for involuntary manslaughter against the corporate defendants. To arrive at that conclusion, however, defendants first note that the corporate defendants could be culpable only through the acts and omissions of the individual defendants. Defendants observe that the mind and mental state of a corporation are the collective mind and mental state of its board of directors or high managerial agents. (See Ill. Rev. Stat. 1981, ch. 38, par. 5—4(a)(2).) Further noting that involuntary manslaughter is based on unintended and reckless conduct (see Ill. Rev. Stat. 1981, ch. 38, pars. 4—6, 9—3(a)), defendants reason the convictions against the corporate entities for that offense are inconsistent with the individual defendants' convictions for murder because both offenses were based on the same conduct: the acts of the individual defendants.

■ We find it helpful to set out the pertinent statutory language of the offenses for which the defendants were convicted. The Criminal Code of 1961 defines "murder" as follows:

"A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:
    * * *
He *knows* that such acts create a strong probability of death or great bodily harm to that individual[.]" (Emphasis added.)

(Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(2).)
"Involuntary manslaughter" is defined as:

> "A person who *unintentionally* kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them *recklessly*[.]" (Emphasis added.)

(Ill. Rev. Stat. 1981, ch. 38, par. 9—3(a).)
"Reckless conduct" is defined as:

> "A person who causes bodily harm to or endangers the bodily safety of an individual by any means, commits reckless conduct if he performs *recklessly* the acts which cause the harm or endanger safety, whether they otherwise are lawful or unlawful." (Emphasis added.) Ill. Rev. Stat. 1981, ch. 38, par. 12—5(a).

The supreme court, in *People v. Spears* (1986), 112 Ill. 2d 396, 493 N.E.2d 1030, and *People v. Hoffer* (1985), 106 Ill. 2d 186, 478 N.E.2d 335, has addressed issues with respect to consistency of verdicts rendered for the above offenses in light of the mental states required to sustain each.

In *Hoffer*, defendant Donald Hoffer was indicted on three counts of murder in the shooting death of Harold (Ed) Peters. In a trial before a jury, the State presented evidence that Hoffer shot Peters with a shotgun after a heated exchange of words outside Hoffer's home. Hoffer testified that he thought Peters was reaching for a gun at the time of the shooting. Hoffer stated the shotgun discharged as he lowered it with one hand and reached with his other hand to grab the gunstock.

Pursuant to Illinois Pattern Jury Instructions, the trial judge instructed the jury that the offense of murder included the offenses of voluntary and involuntary manslaughter. Definitional and issues instructions were tendered to the jury on murder, voluntary manslaughter (unreasonable belief that the killing was justified), and involuntary manslaughter. The jurors, however, were not informed that they could return a guilty verdict on only one of the offenses. *Hoffer*, 106 Ill. 2d at 193, 478 N.E.2d at 339.

On appeal, the appellate court vacated all three convictions and remanded the cause for a new trial.

■ The supreme court affirmed the reversal, rejecting the State's argument that the verdicts could be reconciled because the mental state required for murder "subsumed the lesser mental states required for voluntary manslaughter and involuntary manslaughter." (*Hoffer*, 106 Ill. 2d at 193-94, 478 N.E.2d at 339.) After noting the

three offenses differed only in the particular mental culpability required to sustain each, the court concluded the mental states involved are mutually inconsistent. (*Hoffer*, 106 Ill. 2d at 195, 478 N.E.2d at 340.) Thus, "[w]here a determination is made that one [of the mental states] exists, the others, to be legally consistent, must be found not to exist." *Hoffer*, 106 Ill. 2d at 195, 478 N.E.2d at 340.

Subsequently, in *People v. Spears* (1986), 112 Ill. 2d 396, 493 N.E.2d 1030, the supreme court applied the *Hoffer* rule despite the State's contention that *Spears* involved separable acts and conduct toward multiple victims and, therefore, the rationale in *Hoffer* did not apply.

Defendant Henry Spears was charged with attempted murder (Ill. Rev. Stat. 1983, ch. 38, par. 8—4(a)) and armed violence (based on the great-bodily-harm form of aggravated battery) (Ill. Rev. Stat. 1983, ch. 38, par. 33A—2) in the shooting of his estranged wife, Barbara. Spears was also charged with armed violence in the shooting of Annette Keys. In his jury trial, the State presented evidence that Spears was at his estranged wife's apartment where she, Keys, and two other women had been playing cards. At some point, Spears and Barbara scuffled. Spears drew a gun from a shoulder holster and aimed it at Barbara as she tried to scramble to a side wall. The defendant fired a shot which struck Barbara before she reached the wall. Although Spears was grabbed from behind, he fired a second shot, striking both Barbara and Keys. Spears fired a third shot at Barbara's head, but missed her.

In his defense, Spears testified that Barbara had pushed him and he had stumbled. When someone then grabbed him from behind, he panicked and pulled the gun from the holster. In the ensuing struggle, the gun accidentally fired.

Pattern jury definitional and issues instructions were tendered for attempted murder, armed violence, and two uncharged counts of reckless conduct (Ill. Rev. Stat. 1983, ch. 38, par. 12—5(a)), which, at defendant's request, the jury was instructed to consider as a lesser included offense of the two armed-violence counts. Five verdict forms were provided: one for the attempted murder of Barbara, two for armed violence, and two for reckless conduct as to Barbara and Annette Keys.

The jury found defendant guilty on all five counts. However, the court entered judgment only on the attempted-murder count and one armed-violence count. The appellate court, with one justice dissenting, determined the verdicts were inconsistent and remanded the cause for a new trial.

■ The supreme court affirmed the reversal. The court agreed, generally, that where a claim of inconsistent guilty verdicts involves multiple shots or victims, the question is whether the trier of fact could rationally find separable acts accompanied by mental states to support all of the verdicts as legally consistent. (*Spears*, 112 Ill. 2d at 405, 493 N.E.2d at 1034.) However, the court noted that that principle found no application where the State was attempting to justify guilty verdicts in direct conflict with both its theory of the case at trial and evidence it presented in support of that theory. (*Spears*, 112 Ill. 2d at 405, 493 N.E.2d at 1034.) The court stated:

> "It would be manifestly unfair to allow the State, with the benefit of hindsight, to be able to create separable acts on appeal, neither alleged nor proved at trial. Such an inquiry does not operate in a vacuum. The manner by which a defendant is charged, and the jury is instructed, provides the essential framework for analyzing the consistency of jury verdicts in the troublesome context of multiple shots or victims. *We believe that the substance of the allegations charging the defendant, as an unequivocal expression of prosecutorial intent [citation], and what the evidence showed in relation to those charges, are of particular importance in determining whether guilty verdicts could rationally and consistently be based upon separable acts accompanied by the requisite mental states.*" (Emphasis added.) *Spears*, 112 Ill. 2d at 405-06, 493 N.E.2d at 1034.

The court examined the information and observed that the State had not charged a separate offense for each action or shot fired by defendant. As to conduct toward Barbara, the State had based each of its three charges on the two shots which actually struck her. (*Spears*, 112 Ill. 2d at 406, 493 N.E.2d at 1034.) Because the same conduct was used as the basis for those charges, the court found the contention of separate acts untenable. (*Spears*, 112 Ill. 2d at 406, 493 N.E.2d at 1034.) More importantly the court noted, even assuming defendant's acts were separable, evidence in the record did not support the State's argument that the defendant's mental state changed during the shootings to support the State's hypothesis. (*Spears*, 112 Ill. 2d at 406, 493 N.E.2d at 1034.) Neither the State nor the defense had presented any evidence to suggest defendant's state of mind had varied during his acts. (*Spears*, 112 Ill. 2d at 406, 493 N.E.2d at 1034.) Because the jury's verdicts as to defendant's conduct toward Barbara for offenses requiring otherwise mutually inconsistent mental states could not be reconciled based on separable acts or a change in defendant's mental state, the supreme court determined the verdicts

were legally inconsistent under *Hoffer*. *Spears*, 112 Ill. 2d at 406-07, 493 N.E.2d at 1034-35.

The supreme court further noted that the *Hoffer* rule also controlled the guilty verdicts for defendant's conduct toward Keys. By its guilty verdict, the jury found, in effect, that defendant had acted both recklessly (reckless conduct) and knowingly (armed violence predicated on aggravated battery) in firing the single shot which struck Keys. Based on that single act, the verdicts were legally inconsistent. *Spears*, 112 Ill. 2d at 407, 493 N.E.2d at 1035.

Under the rule in *Hoffer*, the judgments rendered by the circuit court in the instant case appear inconsistent as based on mutually exclusive mental states. However, we must consider whether, under similar analysis used by the supreme court in *Spears*, the judgments are supported by separable acts occurring at different times against different victims by legally different defendants. We therefore begin with a review of the indictments, as they represent the State's prosecutorial intentions in charging defendants, and proceed to evaluate the record of evidence in light of those charges.

The murder indictment states that on February 10, 1983, defendants O'Neil, Kirschbaum, Rodriguez, Pett, and Mackay, acting as individuals and as officers and high managerial agents of Film Recovery, committed murder in that they knowingly created a strong probability of Stefan Golab's death. Specifically, the grand jury charged those individuals had "failed to disclose and make known to [Golab] that he was working with cyanide and substances containing cyanide and failed to instruct him as to matters involving safety procedures and proper handling of said chemicals[.]" Further, those individuals "failed to provide *** Golab with appropriate and necessary safety and first-aid equipment and sundry health-monitoring systems for his protection while working with and handling cyanide and substances containing cyanide[.]" The murder indictment also states O'Neil, Kirschbaum, Rodriguez, Pett, and Mackay failed to "properly provide for the storage, detoxification and disposition of *** cyanide and substances containing cyanide *** [and] failed to advise *** Golab of the dangerous nature of his work, and the conditions under which he engaged in it[.]"

The involuntary manslaughter indictment against Film Recovery and Metallic Marketing states that, on February 10, 1983, they "unintentionally killed Stefan Golab by authorizing, requesting, commanding and performing certain acts of commission and acts of omission[] by its [*sic*] officers, board of directors and high managerial agents, to wit: Steven J. O'Neil, Michael T. Mackay, Gerald Pett, Charles Kirsch-

baum, Daniel Rodriguez, and others, who acting within the scope of their employment *** performed the said acts recklessly in such manner as was likely to cause death and great bodily harm to some individual and *** caused the death of Stefan Golab[,]" The indictment did not otherwise specify the nature of the acts.

The indictments against all defendants for reckless conduct contain identical charges made in the murder indictment against the individual defendants as summarized above, save for stating that the conduct occurred "on or about March 1982 through March 1983."

■ With regard to the consistency of the judgments for murder and reckless conduct against defendants O'Neil, Kirschbaum, and Rodriguez, acting solely in their individual capacities, we note the corresponding indictments differ only in one respect. The murder indictment is limited to the individual defendants' conduct on February 10, 1983, while the reckless conduct indictments concern conduct over a period of time from March 1982 through March 1983, which would include the date of Golab's death. In all other respects, the same conduct is used as the foundation for the indictments for both offenses against the individual defendants. Although the indictments for both offenses are therefore based on identical acts of the individual defendants, it is conceivable the apparent inconsistency in the convictions for those offenses, due to the mutual exclusiveness of the mental states required to sustain each, might be reconciled by evidence in the record. After carefully reviewing the record, however, we do not conclude that, as to the individual defendants, evidence existed to establish, separately, defendants' mental states to support separate offenses of murder and reckless conduct.

A total of four witnesses testified exclusively as to events which might establish defendants' mental states on February 10, 1983. Michael W. Lackman, an Elk Grove fireman and paramedic who responded to the emergency call on February 10, 1983, did not testify as to any condition of the plant at Film Recovery and stated only that someone told him cyanide was used at Film Recovery's plant. Kenneth Kvidera, an Elk Grove Village police officer who assisted in the ambulance call, stated that when he went into the plant on February 10, 1983, he smelled a strong, foul odor which made him gag and experienced a burning sensation in his throat. Kvidera also noted that a "yellowish-orange" haze was visible in the plant. Kenneth Kryzywicki, another Elk Grove Village police officer who responded to the emergency call from Film Recovery on February 10, 1983, also testified to experiencing a burning sensation in his throat when inside the plant. He stated he had difficulty breathing, that his chest hurt, and

his eyes teared. Kryzywicki also noted the mist in the plant air and observed that workers present wore paper masks over their faces but did not wear any other protective clothing or equipment. Gordon Hollywood, an Elk Grove Village police investigator, testified to substantially the same facts as Kryzywicki.

The only other witness to testify exclusively with respect to events of February 10 1983, was Mohammed Hassan, the emergency room physician at Alexian Brothers Hospital who treated Golab. Hassan did not testify as to any facts which might establish defendants' states of mind on February 10, 1983.

Several other plant workers testified to being in the plant on February 10, 1983, but their testimony does not establish what the conditions were in the plant on that particular day. Roman Guzowski testified that he was working with Golab when Golab became faint. Antonio Roman and Juan Fuentes testified they were working nearby and saw Golab trembling and begin to foam at the mouth. The parties stipulated that Elevterio Salinas would testify to similar facts. Through other stipulations, the parties agreed Mario Rodriquez and Juan Hernandez would testify they were present when Golab died. In addition, Debra Sadzeck, a bookkeeper, stated she was in the plant on February 10, 1983, retrieving payroll cards, when she saw Golab "slumped over" in the lunchroom.

None of the above testimony in any way substantially differs from that otherwise contained in the record regarding conditions in the plant, generally. Thus, we cannot conclude the record supports a determination that the individual defendants possessed different mental states on February 10, 1983, as distinguished from the period of March 1982 to March 1983, such as might support separate offenses of murder and reckless conduct. While we do not believe it helpful to summarize the considerable amount of that testimony in detail here, those who testified as to working conditions in the plant established the following: workers were not told that they were working with cyanide or that the compound put into the vats could be harmful when inhaled; although ceiling fans existed above the vats, ventilation in the plant was poor; workers were not informed they were working with cyanide and were given no safety instruction; workers were given no goggles to protect their eyes; workers were given no protective clothing and, as a result, workers' clothing would become wet with the solution used in the vats; there were small puddles of that solution as well as film chips on the plant floor around the vats; the solution burned exposed skin; a strong and foul odor permeated the plant; the condition of air in the plant made breathing difficult and painful; and,

finally, workers experienced dizziness, nausea, headaches, and bouts of vomiting.

Because the offenses of murder and reckless conduct require mutually exclusive mental states, and because we conclude the same evidence of the individual defendants' conduct is used to support both offenses and does not establish, separately, each of the requisite mental states, we conclude that the convictions are legally inconsistent.

With regard to consistency of the judgment for murder against individual defendants O'Neil, Kirschbaum, and Rodriguez and that against the corporate entities for involuntary manslaughter, we observe that the corresponding indictments are both based on Golab's death on February 10, 1983. However, unlike the murder indictment, the indictment for involuntary manslaughter does not specify the "acts of commission and omission" upon which that charge was based. The material difference between the indictments, however, concerns reference to unnamed "others" in the involuntary manslaughter indictment as acting on behalf of the corporations in causing Golab's death in addition to naming the same individuals named in the murder indictment. To the extent the involuntary manslaughter indictment contemplates the conduct of others, as well as the individual defendants convicted of murder, as providing a basis for corporate criminal responsibility, it is possible the judgments against the corporate defendants for involuntary manslaughter could be consistent with the judgments for murder against the individual defendants.

To state it differently, in Illinois, a corporation is criminally responsible for offenses "authorized, requested, commanded, or performed, by the board of directors or by *a* high managerial agent acting within the scope of his employment." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 5—4(a)(2).) A high managerial agent is defined as "an officer of the corporation, or any other agent who has a position of comparable authority for the formulation of corporate policy or the supervision of subordinate employees in a managerial capacity." (Ill. Rev. Stat. 1981, ch. 38, par. 5—4(c)(2).) Thus, a corporation is criminally responsible whenever any of its high managerial agents possesses the requisite mental state and is responsible for a criminal offense while acting within the scope of his employment. To the extent the record discloses that a high managerial agent of Film Recovery or Metallic Marketing, other than individual defendants O'Neil, Kirschbaum, and Rodriguez, might provide foundation for the charge of involuntary manslaughter, that judgment would not be inconsistent with judgment for murder against the individual defendants.

We first note that, because Pett was acquitted of all charges, we

do not believe his conduct can be considered in establishing corporate criminal responsibility. As Pett's acts did not support either the charge against him for murder, requiring intentional conduct, or for reckless conduct, requiring recklessness, we find no basis upon which we could conclude he could have performed the offense of involuntary manslaughter. Further, recognizing Pett's acquittal might not necessarily preclude a determination that, while he may not have performed the offense, he otherwise authorized, requested, or commanded its performance, we observe that the record contains no evidence to support criminal responsibility on that basis.

In addition to O'Neil, Rodriguez, Kirschbaum, and Pett, other directors or high managerial agents of the corporations are identified in the record. Testimony established that Al Tolin was on the board of directors at Film Recovery and that Milton Marks was considered a vice-president of Metallic Marketing. The record also establishes that, for approximately seven months from November 1982 until the summer of 1983, Glenn N. Love was employed as the comptroller at Film Recovery. Further, Thomas VandenLangenberg was employed at Film Recovery for approximately one year, beginning November 1980, as manager of the shipping and receiving department and, thereafter, until January 1983, in the accounts payable department, keeping track of customer accounts. However, beyond testimony identifying those individuals and their positions in the corporations' structures, the record does not contain evidence of any conduct of those individuals such as would provide foundation to establish criminal liability against either of the corporate defendants for involuntary manslaughter.

The record discloses evidence as to only five other individuals whose conduct might conceivably support the charge of involuntary manslaughter such as might provide a basis to reconcile the judgment for that offense against the corporate defendants with the judgment for murder against O'Neil, Rodriguez, and Kirschbaum. Those individuals were Michael T. Mackay, who was indicted but not tried, Richard Stucker, Bob Major, Antonio Roman, and Fred Kopp, who were not named in the indictments. We summarize below, in detail, the nature and extent of evidence in the record with respect to the conduct of those individuals.

Regarding Michael T. Mackay, Susan Bellomo, a secretary at Film Recovery, testified that Mackay was associated with Metallic Marketing. Debra Sadzeck testified that Mackay was on the board of directors at Film Recovery. Sadzeck also stated that Mackay was involved in operations of Silver Recovery Systems, Inc., a company operating

out of Salt Lake City, Utah. She acknowledged that she might have taken orders from Mackay during December 1982, or January or February 1983, if he "called in."

Regarding Richard Stucker, Officer Kenneth Kvidera testified that on February 10, 1983, he spoke to Stucker, who identified himself as the vice-president of Film Recovery. Kvidera stated he was told Stucker was present when Golab was carried out of the plant on February 10, 1983, after Golab collapsed. Investigator Gordon Hollywood testified that he spoke to Stucker along with Officer Kvidera on February 10, 1983. After that conversation, he accompanied Stucker through the plant to the warehouse area, where, Stucker explained, Golab had been working. Hollywood stated Stucker did not expressly tell Hollywood that Stucker was vice-president of Film Recovery. Hollywood stated, however, that he saw Stucker "directing people," indicating to him that Stucker was someone "in charge." Debra Sadzeck testified Stucker was sales coordinator for Film Recovery. Kathy Erpito, who had been employed as a receptionist and as an accountant at Film Recovery, testified Stucker was one of her "bosses." She stated Stucker was also a corporate officer of Associate Silver Recyclers, Inc., which operated out of the same premises as Film Recovery. Erpito testified Stucker signed checks for Associate Silver Recyclers, Inc., to Film Recovery and Metallic Marketing.

Regarding Bob Major, Susan Bellomo testified Major was one of the individuals she took orders from. Bellomo stated she had asked Major, along with O'Neil, Kirschbaum, Pett, and Fred Kopp, about fumes that she smelled in the office. She was told by everyone she asked that the smell came from the chemical used in the plant. The smell was attributed to ventilation in the plant or the opening and closing of the plant's doors. Bellomo stated Major was one of the individuals she would advise concerning visits by firemen or fire inspectors. Debra Sadzeck described Major as O'Neil's "right-hand man." Sadzeck stated that Major's title was "director of education" at Film Recovery's plant. Michael Selway, an industrial hygienist for the United States Department of Labor Occupational Safety and Health Administration, testified that on February 22, 1983, he spoke to Major when he visited Film Recovery after being assigned to investigate Golab's death. Selway also identified Major as the director of education. Selway testified he understood Major's responsibility to be to "go out into the field and educate people" as to the process used at the plant.

Regarding Antonio Roman, Secundino Boyas, a plant worker at Film Recovery, testified Roman was "like a supervisor." Juan Fuentes

stated that Roman was "in charge" of and gave orders to workers grinding film for processing. The parties stipulated that, if called to testify, Jose Campos, also a plant worker, would establish that Roman was his boss when Campos worked in the film grinding room.

In his own testimony, Roman denied that he was a boss. He indicated that, because he could speak English and Spanish, Kirschbaum occasionally would have him tell only Spanish-speaking plant workers what Kirschbaum wanted them to do.

Regarding Fred Kopp, in addition to the reference to Kopp in her testimony noted above, Susan Bellomo testified Kopp was general manager of Film Recovery. Bellomo described Kopp's title as "vice-president." She stated Kopp had "decision-making powers" at Film Recovery and was involved in the day-to-day operations of the plant during 1982. Bellomo testified Kopp left Film Recovery in January 1983 and was not employed with the company when Golab died. Glenn N. Love testified Kopp left Film Recovery in December 1982 and had no further involvement with the corporation. Debra Sadzeck stated Kopp was a vice-president of Metallic Marketing and was on the board of directors of Film Recovery. Kathy Erpito named Kopp as one of her bosses at Film Recovery and stated she complained to him about headaches she experienced while at work.

In his own testimony, Kopp acknowledged that he was general manager at Film Recovery and stated that while he was employed at Film Recovery he was in charge of plant operations. Kopp testified he joined Film Recovery in January of 1980 and worked there until he was terminated in October 1982. Kopp stated his direct involvement in the plant ended in August 1981, although he did return occasionally. Kopp's direct testimony otherwise concerned, generally, efforts taken to insure the safety of workers in the plant, including testing air in the plant, furnishing safety equipment and protective gear for workers, and adding ventilation fans.

On cross-examination by the State, Kopp admitted that when the cyanide compound was first put into the tanks in which the granulated film was soaked, there was a possibility of producing cyanide gas. Kopp stated workers would work over those tanks on the day after the solution was mixed. Kopp admitted that, other than the ceiling fans, there was no local exhaust mechanism on those tanks and that, if cyanide gas was released, the workers working over the tanks had no protection from inhaling cyanide gas.

◎6 After carefully considering the above testimony, we cannot conclude the record supports a basis upon which we might reconcile the individual defendants' convictions for murder with the convictions

for involuntary manslaughter against Film Recovery and Metallic Marketing.

First, we must dismiss any consideration of the conduct of Antonio Roman because there is no evidence in the record that Roman was in any way responsible for formulating corporate policy or supervising subordinate employees in a managerial capacity for either Film Recovery or Metallic Marketing. Roman's supervisory authority at Film Recovery was limited to those workers granulating film and amounted to nothing more than translating, into Spanish, directions of Kirschbaum to those workers who could not understand English. Further, there is no evidence linking Roman to the operations of Metallic Marketing.

While the record indicates the other individuals might be considered high managerial agents of one or both of the corporations, we do not find evidence of their conduct in the record to show they committed the offense of involuntary manslaughter to establish criminal responsibility as to the corporate defendants.

The record contains no evidence of any conduct of Michael T. Mackay, either in his association with Metallic Marketing or as a director of Film Recovery, other than to possibly have given orders to Debra Sadzeck. No testimony establishes what such orders might have been.

In similar fashion, although evidence establishes Richard Stucker as a vice-president of Film Recovery with authority to direct subordinate employees, the record fails to contain evidence of any conduct which might form a basis for criminal responsibility against Film Recovery for involuntary manslaughter. Testimony establishes only that Stucker was on the premises on the day Golab died. No evidence links Stucker to the operations of Metallic Marketing.

Although Bob Major was identified as the director of education at Film Recovery and as O'Neil's "right-hand man," the record again fails to contain evidence of any conduct by Major whatsoever which might support a charge of involuntary manslaughter. No evidence links Major to the operations of Metallic Marketing.

The testimony of and about Fred Kopp comes nearest to providing support for the charge of involuntary manslaughter against Film Recovery. That testimony establishes that Kopp was the general manager of Film Recovery and was, while employed there, involved in day-to-day operations in the plant. By his own admission, Kopp stated it was possible that workers working over the tanks in which film was being soaked could inhale any resulting gas fumes produced and were not protected from doing so through a local exhaust system or other protective means. However, the record establishes that Kopp's em-

ployment at Film Recovery ended, at the earliest, in August 1982, or, at the latest, in January 1983. In either case, testimony establishes that Kopp was not employed at Film Recovery at the time of Golab's death on February 10, 1983. Even assuming that Kopp's admissions indicate the type of conduct as might otherwise provide foundation for criminal responsibility against Film Recovery for involuntary manslaughter, the record contains no evidence that Kopp's conduct, while employed with Film Recovery, caused Golab's death after Kopp had left the company. No evidence links Kopp with the operations of Metallic Marketing.

Therefore, we find no basis in the record upon which to conclude that the conduct of a high managerial agent, apart from that of the individual defendants found guilty of murder, could provide the basis for establishing criminal responsibility against the corporate defendants for Golab's death. And, because the same conduct is used to support offenses which have mutually exclusive mental states, we conclude the judgments rendered for both offenses are legally inconsistent.

■■ ■ In *Hoffer*, the supreme court affirmed its earlier pronouncement in *People v. Frias* (1983), 99 Ill. 2d 193, 457 N.E.2d 1233, and *People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840, that, where judgments are legally inconsistent, as they are when rendered for offenses requiring mutually exclusive mental states, reversal and retrial must follow. (*People v. Hoffer* (1985), 106 Ill. 2d 186, 195-99, 478 N.E.2d 335, 340-42.) We are mindful, however, the supreme court has also directed that, where, as in the instant case, defendants challenge the sufficiency of evidence at the first trial, it is necessary to address that issue to avoid the risk of subjecting defendants to double jeopardy. (*People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366.) Our review of the record does not lead us to conclude that the evidence, as first adduced, was so insufficient as to bar retrial.

Evidence at trial indicated Golab died after inhaling poisonous cyanide fumes while working in a plant operated by Film Recovery and its sister corporation Metallic Marketing where such fumes resulted from a process employed to remove silver from used X-ray and photographic film. The record contains substantial evidence regarding the nature of working conditions inside the plant. Testimony established that air inside the plant was foul smelling and made breathing difficult and painful. Plant workers experienced dizziness, nausea, headaches, and bouts of vomiting. There is evidence that plant workers were not informed they were working with cyanide. Nor were they informed of the presence of, or danger of breathing, cyanide gas. Venti-

lation in the plant was poor. Plant workers were given neither safety instruction nor adequate protective clothing. Finally, testimony established that defendants O'Neil, Kirschbaum, and Rodriguez were responsible for operating the plant under those conditions. For purposes of our disposition, we find further elaboration on the evidence unnecessary. Moreover, although we have determined evidence in the record is not so insufficient as to bar retrial, our determination of the sufficiency of the evidence should not be in any way interpreted as a finding as to defendants' guilt that would be binding on the court on retrial.

Reversed and remanded.

COCCIA, P.J., and MURRAY, J., concur.