Fourth Division
March 31, 2010

No. 1-07-3303

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | 04 CR 2262 |
| | ) | |
| UNIVERSAL PUBLIC TRANSPORTATION, INC., | ) | |
| | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE NEVILLE delivered the opinion of the court:

The defendant, Universal Public Transportation, Inc. (UPT), was convicted, following a bench trial, of vendor fraud (305 ILCS 5/8A-3) (West 2000)), theft (720 ILCS 5/16-1 (West 2000)), and money laundering (720 ILCS 5/29B-1 (West 2000)). UPT was sentenced to one-year conditional discharge and ordered to pay $2,966,187.38 in restitution and $200,000 in fines. On appeal, UPT presents the following issues for our review: (1) whether UPT was proved guilty beyond a reasonable doubt of vendor fraud, money laundering, and theft; (2) whether UPT's convictions must be reversed as legally inconsistent where the trial court acquitted the individual owner of the same charges; (3) whether the trial court erred in admitting financial records from the Illinois Department of Public Aid as business records; and (4) whether the trial court erred in ordering UPT to pay $2,966,187.38 in

restitution. For the following reasons, we affirm UPT's convictions for vendor fraud and theft, vacate UPT's conviction for money laundering, vacate the order for fines and restitution, and remand for a new trial and resentencing.

## BACKGROUND

On January 20, 2004, UPT, Irit Gutman, Mike Tishel, and Ilya Lubenskiy were each charged with vendor fraud, theft, and money laundering. On November 3, 2004, Lubenskiy entered into a plea agreement with the State and pled guilty to vendor fraud in exchange for his testimony against Gutman, Tishel, and UPT. On April 25, 2005, Gutman filed a motion for severance, and the trial court granted the motion and held simultaneous bench trials that involved Gutman, Tishel, and UPT.

### The State's Case

Lubenskiy testified that he pled guilty to forgery and mail fraud in federal court in 2003 and pled guilty in 2004 in the instant case and agreed to testify truthfully for the State. Lubenskiy explained the "prior approval system" used by the State of Illinois for the Medicaid program from the late 1990s until June 2001. Specifically, Lubenskiy testified that recipients in need of transportation to medical services called the local public aid office and requested transportation. The public aid office called a transportation company, informed the transportation company when and where the transportation company was supposed to provide the service, and the transportation company provided the service. A few months later, the public aid office would send the transportation company a copy of the prior approval number. The transportation company would submit a bill and be paid for its services.

Lubenskiy met Gutman in 1993 when they worked for A.K. Medical Transportation

Company (A.K.). In 1995, he and Gutman opened Egra Medical Transportation. Gutman spoke with the recipients and the public aid office, and Lubenskiy performed the bookkeeping. By 1999, Lubenskiy and Gutman co-owned additional companies, all of which were located in the same office space.

In February or March of 1999, Gutman told Lubenskiy that the public aid office had sent her a prior approval form with an incorrect code. The person from the public aid office instructed Gutman to delete the incorrect code and insert the correct code. Gutman suggested that they make changes on other prior approval forms. Gutman also suggested that they order blank prior approval forms and rewrite the forms. In order to increase their payments, she suggested that they alter the destination, change the category of service, or increase the number of miles traveled. Finally, at Gutman's suggestion, Lubenskiy sent bills with altered destinations and modified categories of service to the public aid office for which they were eventually paid.

Lubenskiy identified exhibit 129 as the December 1, 1999, agreement between Lubenskiy, Gutman, and the federal government in which he and Gutman agreed to be permanently barred from participating in the Medicare program, all other federal healthcare programs, and the Illinois Medical Assistance Program. After they signed the agreement, Lubenskiy told Gutman that they had to sell the companies because their accounts were frozen as a result of their agreement. Gutman suggested that they rename the company and find a third partner. In December 2000, Lubenskiy and Gutman met with Tishel. Gutman offered Tishel 50% of the company and explained that she and Lubenskiy would run the company and Tishel would receive a salary. Lubenskiy testified that because he and Gutman were barred from participating in the Medicaid programs, Tishel was supposed to appear

as the sole owner of the company. According to Lubenskiy, Tishel said it would only be fair if he owned a third, rather than half, of the company.

UPT began doing business on January 16, 2001. Except for the name change, the business remained the same: they had the same vehicles, the same drivers, the same employees and the same office space. Gutman continued to talk with the public aid office, using an alias; Lubenskiy continued to perform the bookkeeping; and Tishel signed and deposited checks received from the public aid office into a bank account on which only Tishel and his son were the authorized signatories.

Lubenskiy further testified that money was transferred from the UPT business account to Tishel's personal account and from Tishel's personal account to Gutman's account. The money issued to Gutman's account was used to purchase single-family homes that were put in Gutman's name. However, Lubenskiy testified that he did not receive half of the property as agreed. Lubenskiy identified exhibit 130 as a trustee's deed dated January 29, 1998, for property in Galena owned by him and Gutman. Lubenskiy identified exhibit 131 as a quitclaim deed dated May 10, 2000, bearing his and Gutman's names transferring the Galena property to Gutman's son. Lubenskiy explained that they were attempting to hide the property. Lubenskiy identified exhibit 132 as a mortgage for $224,000 on the Galena property recorded on February 26, 2001. Lubenskiy identified exhibit 53 as a check from the title company dated February 26, 2001, in the amount of $216,720.50. Lubenskiy identified exhibit 54 as a deposit ticket for the UPT account in the amount of $216,720.50.

Lubenskiy further testified that he and Gutman purchased cars with funds from UPT.

Lubenskiy identified exhibit 61 as an invoice for a Mercedes owned by him and Gutman and used by Gutman. Lubenskiy identified exhibit 62 as a receipt dated March 13, 2002, for another Mercedes owned by Gutman and Ezra Entertainment that he used. Lubenskiy testified that from January 16, 2001, until February 2002, UPT billed the State of Illinois approximately $6 million and received approximately $3 million. Finally, Lubenskiy testified that they eventually sold the business to Arik Amzaleg and Tishel for $600,000, but they only received $400,000.

On cross-examination, Lubenskiy testified that Tishel did not know about the false billings. Specifically, Lubenskiy explained that a legitimate business was being run out of the UPT office location while Lubenskiy ran a second business from a second office that billed public aid. From the second office, Lubenskiy billed the State of Illinois approximately $6 million and received approximately $3 million.

Robert Kramer testified that he is employed by the Illinois Department of Health and Human Services, which was formally known as the Illinois Department of Public Aid. In 2001, he supervised the employees who arranged medical transportation. Kramer explained that a recipient would call the public aid office and ask for transportation to a medical appointment. If the recipient had an up-to-date medical record and doctor's approval, the public aid office would schedule the transportation with a medical transportation company. The public aid office would then complete a prior approval form. The prior approval form consisted of two copies - a white copy and a yellow copy. The public aid office kept the white copy for their records and the medical transportation provider received the yellow copy. The public aid office kept the white copies in file cabinets and boxes. At some point, the police requested UPT's proper approval forms. The public aid office was

unable to locate all of UPT's files. Kramer identified exhibit 133 as a box containing some of UPT's prior approval forms that the public aid office was able to find. Kramer testified that the contents of exhibit 133 were kept in the regular course of business.

Nicholas Cozzolino testified that he is an investigator for the Illinois State Police. In April 2006, he conducted an investigation of UPT. Using the directions provided in Mapquest, he drove the routes most frequently billed by UPT. He identified exhibits 81 through 128[1] as the routes he drove and the corresponding mileage he recorded. Investigator Cozzolino testified that he compiled the information into an investigative report and gave the report to Virma Rodriguez, an auditor for the Illinois State Police and Illinois Department of Public Aid.

Alla Denisenkio testified that she has known Lubenskiy and Gutman since 1999, when she worked for Ezra. She has also worked for other medical transportation companies owned by Lubenskiy and Gutman, including Tamid Medical Transportation, A.K., Purple Heart, and Etza. In January 2001, when the company changed its name to UPT, everything in the business remained the same except that Lubenskiy stopped coming into the office. Gutman also informed Denisenkio that Tishel was the new owner and that he would sign the paychecks. On cross-examination, Denisenkio testified that Tishel told her what to do with the orders after she took them. She further testified that she never created false billings.

Ilona Golshmit testified that she has known Lubenskiy and Gutman since 1998, when she worked for Ezra. The name of the company changed and some of the names were as follows: Ezta,

---

[1]The parties subsequently stipulated to exhibits 81 through 128.

A.K., Purple Heart, and UPT. Gutman and Lubenskiy owned all of the companies except for UPT, which was owned by Tishel. Regardless of the name of the company, the daily operations remained the same: same drivers, same vehicles, same employees, and same job responsibilities. On cross-examination, Golshmit testified that Lubenskiy disappeared after Tishel started working with the company. Golshmit also testified that she did not create false billings.

John Fingley testified that he is the fraud and abuse executive for the office of the Inspector General with the Illinois Department of Health Care and Family Services. The Department was previously called the Illinois Department of Public Aid. The office of the Inspector General is charged with program integrity for the medical assistance program of the State of Illinois. The medical assistance program, or Medicaid, is run by the federal government and gives medical services to the poor and indigent without health insurance. The program reimburses transportation companies for transporting the recipients. The transportation companies have to sign a provider agreement certifying that they will adhere to the department's rules and regulations.

Fingley testified that UPT was a provider in the medical assistance program from January 2001 until February 2002, and that Tishel was listed in the provider agreement as the sole owner of UPT. Pursuant to their settlement agreements, Gutman and Lubenskiy were permanently barred from participating in the medical assistance program. Specifically, neither of them was allowed to be a vendor or provider in the medical assistance program or assume management responsibilities of a vendor or provider. They could not directly or indirectly own 5% or more of a corporate vendor or provider, they could not order goods or services from a provider, and they could not render goods or services as an employee of a vendor.

Virma Rodriguez testified that she was an auditor for the Illinois State Police, Illinois Department of Public Aid, who are now called the Illinois Department of Health Care and Family Services, and audited the billing practices of Medicaid providers, including UPT. She identified group exhibit 133 as a box she obtained from the local public aid office which contained prior approval forms for UPT created by the public aid office. She testified that she pulled from the box all prior approval numbers for UPT from January 2001 to February 2002. She identified exhibit 151 as a list of the prior approval numbers she gathered for UPT. Rodriguez testified that she then sent the list of prior approval numbers to Debbie Helms, the manager of the claims processing unit, so that Helms could give Rodriguez all of the billings paid to UPT for each prior approval number. Rodriguez identified exhibit 154 as a certified copy of the spreadsheet Helms sent to her. Rodriguez identified exhibit 152 as the spreadsheet she created by compiling all of the information she had available to her. Rodriguez explained that she took the recipient's name, identification number, and service date from Helms's spreadsheet and compared the information to the recipient's information from the prior approval numbers. If the recipient's name, identification number or service date did not match on the two spreadsheets, Rodriguez considered it to be a false billing. Rodriguez testified that $67,798.18 of the $71,280.40 UPT billed the State of Illinois were false billings.

Rodriguez identified exhibit 156 as a certified copy of Helms's spreadsheet regarding mileage to and from certain addresses from January 2001 until February 2002. Rodriguez identified exhibit 153 as her spreadsheet containing the service dates, recipient's number, originating place, destination code, actual miles, and submitted miles. After subtracting the miles that should have

been paid[2] from the miles that were actually paid, Rodriguez determined that UPT overbilled the State of Illinois by $176,336.25.

Arik Amzaleg testified that he met Gutman and Lubenskiy in 1999 or 2000 when a business broker approached him about purchasing their business. He declined the offer. In December 2001, the broker approached him about purchasing UPT. Tishel told Amzaleg that he owned UPT on paper, but that two other people, whom Amzaleg identified as Gutman and Lubenskiy, were involved in the business. Tishel explained that 50% of the company was for sale because the people who offered Tishel an ownership interest wanted to sell their portion of the business. Tishel told Amzaleg that the business made $800,000 per year and each party took home $30,000 a month. Amzaleg testified that he attended a closing for UPT on February 27, 2002, and that he and Tishel co-owned the company. On February 28, 2002, he was present when Tishel obtained a cashier's check payable to Gutman and gave it to Lubenskiy.

On cross-examination, Amzaleg testified that the State of Illinois initially refused to pay the new company owned by Tishel and Amzaleg because the State believed Amzaleg was a new front man for the business. The new company hired an attorney and was eventually paid for its services. Amzaleg explained that Lubenskiy never told him how he ran the business; rather, Tishel and the women from the office explained to Amzaleg what had happened at UPT.

Steven Bradley testified that he is the Bureau Chief for the Bureau of Comprehensive Health

---

[2]The parties stipulated to, among other things, the mileage for various trips according to Mapquest.

Services, Division of Medical Programs, Department of Health Care and Family Services. Bradley explained that in the medical assistance program, a base trip includes picking up a patient and delivering him or her from point A to point B. The first 10 miles of a trip is included in the fee for a base trip, but any mileage over the initial 10 miles is reimbursed on a per-mile basis. If a transportation provider submits a claim electronically, the claim passes through a series of computer validation checks to verify that the provider was an eligible provider, that the patient was eligible for medical assistance on the day of service, that the codes billed were in effect on the day of service, and that the forms were filled out correctly. Once the computer determines that the claim is payable, it is assigned a voucher number and sent to the comptroller's office for payment. The check is mailed to the payee at the address listed on the application for participation. During the time in question, the computer did not validate prior approval numbers.

Bradley further testified that UPT was a provider in the medical assistance program from January 2001 until March 2002. Bradley identified exhibit 143 as the enrollment application for UPT, which was signed by Tishel and dated January 16, 2001. Bradley identified exhibit 144 as a copy of the agreement for participation, which indicated that Tishel was the sole owner of UPT.

Debbie Helms testified that she is the data control manager at the Illinois Department of Health Care and Family Services. She processes medical claims, including billing claims for transportation companies. She identified exhibit 154 as a copy of the spreadsheet she created for payments to UPT based upon prior approval numbers provided by Rodriguez. She identified exhibit 155 as a document she created that summarized the trips made by UPT. The total payments to UPT from January 1, 2001, through February 28, 2002, were $71,280.40. She identified exhibit 156 as

a document she prepared which indicated that UPT was paid $235,106.01 for mileage. Helms testified that from January 1, 2001, until February 28, 2002, UPT billed the State of Illinois $2,971,146.42, but the State of Illinois only paid $2,966,187.38. On cross-examination, Helms testified that she had no knowledge if the trips were paid, if the State of Illinois overpaid UPT, or if UPT engaged in any wrongdoing.

The trial court read Tishel's bond hearing testimony into the record. When asked at the bond rehearing if he was the owner of UPT, Tishel responded, "I was the only one on paper. God what they did to me." Tishel further responded that the real owner was Gutman. The State rested its case.

### UPT's Case

Meir Rothstein testified that he was a real estate agent and brokered businesses. He brought Amzaleg to UPT so he and Amzaleg could purchase UPT, but the sale was never completed. Nevertheless, he was at UPT on a daily basis and saw Tishel run the business. During this time, he never saw Lubenskiy at UPT. Lubenskiy was not involved in the negotiations for the purchase of UPT. Rothstein testified that he has known Tishel for approximately 22 years and that Tishel has a reputation for being a man of his word.

Moshe Tishel, codefendant Tishel's son, testified that he was responsible for maintaining the company vehicles when his father owned UPT. Moshe testified that there was no kickback scheme. Finally, Moshe testified that the only contact he had with Lubenskiy was when Lubenskiy leased a vehicle to UPT.

### Trial Court's Findings

On April 19, 2007, the trial court dismissed the charges against Tishel, but found UPT guilty

of money laundering, vendor fraud, and theft. The trial court made several findings. The trial court found that UPT came into existence for one reason: to allow Lubenskiy and Gutman to continue in a business endeavor from which they had been previously barred. Lubenskiy and Gutman needed a front man for UPT, and Tishel "agreed to be the straw man for them knowing that they were barred from doing business." The trial court further found that Lubenskiy and Gutman prevailed upon Tishel to put the business in his name, but the trial court found that it was unclear as to Tishel's level of involvement in the irregularities that took place after the business was put in his name. The trial court found that Lubenskiy and Gutman were partners, but that the State presented no evidence that Tishel was part of the fraudulent scheme. Therefore, the trial court dismissed the charges against Tishel, but found UPT guilty of money laundering, vendor fraud, and theft.

Posttrial Motions

On May 16, 2007, UPT made a motion to vacate the findings of guilt. On June 11, 2007, UPT filed a supplemental motion for reconsideration or, in the alternative, a new trial. On June 12, 2007, at a hearing on the motions, the court reiterated its finding that Gutman and Lubenskiy were the *de facto* officers, and stated that to say that Tishel was the sole officer would "stand everything on its head." On July 24, 2007, the court denied the posttrial motions and ordered UPT to pay restitution of $2,966,187.38, and fines of $200,000.

On August 21, 2007, UPT filed a motion to reconsider or modify the sentence. On October 23, 2007, the trial court denied UPT's motion to reconsider or modify its sentence, amended the sentence to include a one-year conditional discharge, and affirmed its June 24, 2007, order directing UPT to pay restitution of $2,966,187.38 and fines of $200,000. Finally, on November 20, 2007,

UPT filed a notice of appeal.

## ANALYSIS

### Sufficiency of the Evidence

UPT contends that the State failed to prove it guilty of money laundering, vendor fraud, and theft beyond a reasonable doubt. Specifically, UPT contends that the State failed to prove: (1) that Gutman and Lubenskiy were high managerial agents of UPT, (2) that Gutman's and Lubenskiy's actions were within the scope of their employment with UPT, and (3) that Gutman and Lubenskiy acted on behalf of UPT.

A reviewing court, when reviewing the sufficiency of the evidence, must determine " ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.)' " People v. Cardamone, 232 Ill. 2d 504, 511 (2009), quoting People v. Bush, 214 Ill. 2d 318, 326 (2005), quoting Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); People v. Collins, 106 Ill. 2d 237, 261 (1985). A reviewing court must also allow all reasonable inferences from the record in favor of the prosecution. Cardamone, 232 Ill. 2d at 511, quoting Bush, 214 Ill. 2d at 326, citing People v. Cunningham, 212 Ill. 2d 274, 280 (2004). However, a reviewing court will not substitute its judgment for that of the trier of fact. People v. Sutherland, 223 Ill. 2d 187, 242 (2006), citing People v. Collins, 214 Ill. 2d 206, 217 (2005). The trier of fact is responsible for determining the weight to be given to the witnesses' testimony, determining the witnesses' credibility, resolving conflicts in the evidence, and drawing reasonable inferences from the testimony. Sutherland, 223 Ill. 2d at 242, citing People v. Milka, 211 Ill. 2d 150,

178 (2004), and People v. Evans, 209 Ill. 2d 194, 211 (2004). A trier of fact's findings of fact and credibility determinations will be reversed only if they are against the manifest weight of the evidence. People v. Richardson, 234 Ill. 2d 233, 251 (2009), citing People v. Slater, 228 Ill. 2d 137, 149 (2008); In re Christopher K., 217 Ill. 2d 348, 373 (2005).

It is axiomatic that a corporation can only act through its agents. People v. Bohne, 312 Ill. App. 3d 705, 708 (2000). Section 5-4 of the Criminal Code of 1961 explains when a corporation is responsible for the acts of its agents and provides that a corporation may be prosecuted for the commission of an offense if: (1) the commission of the offense is authorized, requested, commanded, or performed by a high managerial agent; (2) the high managerial agent is acting within the scope of his or her employment; and (3) the high managerial agent is acting in behalf of the corporation. 720 ILCS 5/5-4(a)(2) (West 2000). Section 5-4(c)(2) of the Criminal Code defines a "high managerial agent" as "an officer of the corporation, or any other agent who has a position of comparable authority for the formulation of corporate policy or the supervision of subordinate employees in a managerial capacity." 720 ILCS 5/5-4(c)(2) (West 2000).

First, we must determine whether the evidence was sufficient to establish that Gutman and Lubenskiy were "high managerial agents" of UPT that authorized, requested, commanded, or performed acts of vendor fraud, theft, and money laundering. 720 ILCS 5/5-4(a)(2) (West 2000). The trial court found that Gutman and Lubenskiy were the *de facto* officers of UPT. We will not reverse the trial court's finding of fact unless it is against the manifest weight of the evidence. Richardson, 234 Ill. 2d at 251, citing Slater, 228 Ill. 2d at 149; In re Christopher K., 217 Ill. 2d at 373. We find that the following evidence was established at trial through Lubenskiy's testimony: (1)

that, pursuant to Gutman's suggestion, Lubenskiy sent bills to the State of Illinois in excess of what UPT was entitled; (2) that after he and Gutman were barred from participating in the Medicaid program in 1999, Gutman suggested that they rename the company and find a third partner; (3) that in 2000, Gutman offered Tishel 50% of the company and explained that she and Lubenskiy would run the company and Tishel would receive a salary; (4) that Tishel agreed to become a one-third owner of UPT; (5) that UPT commenced doing business on January 16, 2001, and Tishel was listed with the State of Illinois in the agreement for participation as the sole owner; (6) that, except for the name change, the business remained the same: they had the same vehicles, the same drivers, the same employees and the same office space; (7) that Gutman continued to talk with the public aid office using an alias, Lubenskiy continued to perform the bookkeeping and sent inflated bills to the State of Illinois, and Tishel signed and deposited checks into UPT's account that he received from the State of Illinois; (8) that money was transferred from UPT's business account to Tishel's personal account and from Tishel's personal account to Gutman's account; (9) that Gutman and Lubenskiy purchased houses and cars with funds from UPT; and (10) that from January 16, 2001, until February 2002, UPT billed the State of Illinois approximately $6 million and received approximately $3 million. We find that, based upon the aforementioned evidence presented during the trial, the trial court's finding that Gutman and Lubenskiy were the *de facto* officers of UPT was not against the manifest weight of the evidence. Richardson, 234 Ill. 2d at 251, citing Slater, 228 Ill. 2d at 149; In re Christopher K., 217 Ill. 2d at 373. Therefore, because the State presented sufficient evidence to establish that Gutman and Lubenskiy were *de facto* officers of UPT, and that they authorized or performed acts on behalf of UPT, we hold that Gutman and Lubenskiy were high managerial agents

of UPT.  720 ILCS 5/5-4(a)(2), (c)(2) (West 2000).

Next, we must determine whether the evidence was sufficient to establish that Gutman and Lubenskiy, when they were acting as high managerial agents of UPT, were acting within the scope of their employment for UPT when Gutman committed the offenses of vendor fraud and theft and Lubenskiy committed the offense of vendor fraud.  720 ILCS 5/5-4(a)(2) (West 2000).  As indicated above, the evidence presented at trial established: (1) that Gutman and Lubenskiy formed UPT for the purpose of billing the State of Illinois and obtaining payments in a greater amount than they were entitled to; (2) that Tishel agreed that Gutman and Lubenskiy would act as silent partners in UPT; (3) that following the January 16, 2001, formation of UPT, Gutman spoke with the public aid office and the recipients and Lubenskiy submitted bills to the State of Illinois in the name of UPT; and (4) that Gutman and Lubenskiy submitted bills to the State of Illinois on behalf of UPT for $6 million and UPT received $3 million, which exceeded the amount UPT was entitled for its services. Therefore, we hold that  the State presented sufficient evidence to establish that when Gutman and Lubenskiy were acting as high managerial agents of UPT, that they were acting within the scope of their employment when they performed services for UPT from January 16, 2001, until February 2002.  720 ILCS 5/5-4(a)(2) (West 2000).

Next, we must determine whether the evidence was sufficient to establish that Gutman and Lubenskiy, when they were acting as high managerial agents of UPT and within the scope of their employment with UPT, were also acting in behalf of UPT when Gutman committed the offenses of vendor fraud and theft and Lubenskiy committed the offense of vendor fraud.  720 ILCS 5/5-4(a)(2) (West 2000).  As indicated above, the evidence presented at trial established: (1) that Gutman and

Lubenskiy were *de facto* officers or silent partners in UPT; (2) that Gutman and Lubenskiy billed the State of Illinois in the name of UPT and obtained payments in a greater amount than UPT was entitled; and (3) that Gutman and Lubenskiy billed the State of Illinois on behalf of UPT for approximately $6 million and UPT received $3 million. Therefore, we hold that the State presented sufficient evidence to establish that when Gutman and Lubenskiy were acting as high managerial agents of UPT and acting within the scope of their employment at UPT, that they were also acting in behalf of UPT when they billed the State of Illinois for approximately $6 million and UPT received $3 million between January 16, 2001, and February 2002.

Finally, we must determine whether the evidence was sufficient to convict UPT of the three offenses if Gutman and Lubenskiy, high managerial agents of UPT, who were acting within the scope of their employment, and on behalf of UPT, authorized or performed acts and committed the offenses of vendor fraud, theft, and money laundering. 720 ILCS 5/5-4(a)(2) (West 2000). First, with regard to the charge of vendor fraud (305 ILCS 5/8A-3 (West 2000))[3], the record establishes that Lubenskiy pled guilty to vendor fraud in connection with the inflated bills he submitted to the State of Illinois on behalf of UPT. We take judicial notice of the fact that Gutman was also convicted

---

[3]To prove a defendant guilty of vendor fraud, the State must establish that the defendant "willfully, by means of a false statement or representation, or by concealment of any material fact or by other fraudulent scheme or device on behalf of himself or others, obtain[ed] or attempt[ed] to obtain benefits or payments under this Code to which he or it is not entitled, or in a greater amount than that to which he or it is entitled." 305 ILCS 5/8A-3 (2000).

of vendor fraud and we affirmed her conviction on appeal. See People v. Gutman, No. 1-08-1379 (March 31, 2010). Therefore, viewing the evidence in the light most favorable to the prosecution, we hold that the evidence was sufficient to convict UPT of vendor fraud because a corporation can only act through and is responsible for the acts of its agents, and Gutman and Lubenskiy were high managerial agents of UPT, acting within the scope of their employment and in behalf of UPT when they committed vendor fraud by submitting inflated bills to the State of Illinois on behalf of UPT and obtaining payments for UPT under the Public Aid Code (305 ILCS 5/1-1 *et seq*. (West 2000)) in a greater amount than UPT was entitled to. 305 ILCS 5/8A-3 (West 2000); 720 ILCS 5/5-4(a)(2) (West 2000).

Second, with regard to the charge of theft (720 ILCS 5/16-1(a)(1)(A) (West 2000)[4]), we take judicial notice of the fact that Gutman was convicted of theft and that we affirmed her conviction on appeal. Gutman, No. 1-08-1379. Therefore, viewing the evidence in the light most favorable to the prosecution, we hold that the evidence was sufficient to convict UPT of theft because a corporation can only act through and is responsible for the acts its agents and Gutman was a high managerial agent of UPT, acting within the scope of her employment, and in behalf of UPT, when she committed a theft by having UPT exert unauthorized control over the State of Illinois's money with the intent to permanently deprive the State of Illinois of its money. 720 ILCS 5/5-4(a)(2), 16-

---

[4]To prove a defendant guilty of theft, the State must establish that the defendant obtained or exerted unauthorized control over property of the owner and intended to deprive the owner permanently of the use or benefit of the property. 720 ILCS 5/16-1(a)(1)(A) (West 2000).

1-07-3303

1(a)(1)(A) (West 2000).

Finally, with regard to the charge of money laundering (720 ILCS 5/29B-1 (West 2000))[5], this court followed United States v. Santos, 553 U.S. ___, 170 L. Ed. 2d 912, 128 S. Ct. 2020 (2008), and vacated Gutman's money laundering conviction and remanded her case to the trial court. Gutman, No. 1-08-1379. Santos held that the term "proceeds" in the federal money laundering statute is ambiguous, that "proceeds" can mean "receipts" or "profits," and because the "profits" definition of "proceeds" is more defendant-friendly than the "receipts" definition, the rule of lenity dictates that the "profits" definition be adopted. Santos, 553 U.S. at ___, 170 L. Ed. 2d at 920, 128 S. Ct. at 2025. This court followed Santos and held that the trial court erred when it used evidence of UPT's receipts from transactions with the State of Illinois, rather than profits, to find Gutman

---

[5]A person commits the offense of money laundering "when he knowingly engages or attempts to engage in a financial transaction in criminally derived property with either the intent to promote the carrying on of the unlawful activity from which the criminally derived property was obtained or where he knows or reasonably should know that the financial transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the criminally derived property." 720 ILCS 5/29B-1(a) (West 2000). Section 29B-1(b)(4) of the Criminal Code defines "criminally derived property" as "any property constituting or derived from *proceeds* obtained, directly or indirectly, pursuant to a violation of the Criminal Code of 1961, the Illinois Controlled Substances Act or the Cannabis Control Act." (Emphasis added.) 720 ILCS 5/29B-1(b)(4) (West 2000).

- 19 -

guilty of violating the money laundering statute. Gutman, No. 1-08-1379. We find that UPT is a corporation and a corporation can only be found guilty of money laundering if a high managerial agent, herein Gutman, committed the offense of money laundering. 720 ILCS 5/5-4(a)(2), 29B-1 (West 2000). Because a corporation can only act through its agents (Bohne, 312 Ill. App. 3d at 708), once Gutman's money laundering conviction was vacated, UPT's money laundering conviction also had to be vacated. Accordingly, we hold that the trial court erred when it convicted UPT of money laundering, and we vacate UPT's money laundering conviction. 720 ILCS 5/5-4(a)(2), 29B-1 (West 2000); Bohne, 312 Ill. App. 3d at 708.

In conclusion, because we have found that Gutman and Lubenskiy were high managerial agents of UPT, acting within the scope of their employment, and acting on behalf of the corporation when Gutman committed the offenses of vendor fraud and theft and Lubenskiy committed the offense of vendor fraud, we hold that the trial court did not err when it found UPT guilty of the offenses of vendor fraud and theft, the same offenses committed by its high managerial agents. 720 ILCS 5/5-4(a)(2) (West 2000); see also Bohne, 312 Ill. App. 3d at 708.

Legally Inconsistent Verdicts

UPT argues that the trial court erred when it entered legally inconsistent findings when it found UPT guilty of vendor fraud and theft but acquitted Tishel of the same offenses. We disagree. UPT's argument is based on the assumption that Tishel was the only high managerial agent of UPT. We note that Tishel was listed as the sole owner of UPT on the agreement for participation provided to the State. However, because the trial court found that Gutman and Lubenskiy were the *de facto* officers of UPT, and because we have found that the trial court's finding was not against the manifest

weight of the evidence, we find that Tishel was not the sole owner of UPT. Furthermore, for the reasons stated above, we have found that, pursuant to section 5-4 of the Criminal Code, UPT was properly prosecuted and convicted of vendor fraud and theft because a corporation acts through and is responsible for the acts of its agents and because Gutman and Lubenskiy were the high managerial agents of UPT, who acted within the scope of their employment and on behalf of UPT when Gutman committed and was convicted of the offenses of vendor fraud and theft and when Lubenskiy committed and pled guilty to the offense of vendor fraud. 305 ILCS 5/8A-3 (West 2000); 720 ILCS 5/5-4(a)(2), 16-1(a)(1)(A) (West 2000). Therefore, we hold that the trial court did not enter legally inconsistent verdicts when it acquitted Tishel, because Gutman and Lubenskiy were the high managerial agents of UPT, who acted within the scope of their employment and on behalf of UPT when they were convicted of vendor fraud and theft.

UPT cites People v. O'Neil, 194 Ill. App. 3d 79 (1990), in support of its position. In O'Neil, three individual defendants were convicted of the murder of a coworker and two corporate defendants were convicted of the involuntary manslaughter of the same coworker. O'Neil, 194 Ill. App. 3d at 80-81. On appeal, the defendants argued that the judgments for murder and involuntary manslaughter were inconsistent because the offense of murder requires a knowing and intentional act while reckless conduct does not. O'Neil, 194 Ill. App. 3d at 84. The defendants further argued that both convictions arose from the same acts of the individual defendants. O'Neil, 194 Ill. App. 3d at 84. The O'Neil court held that the judgments rendered for the offenses were legally inconsistent because the same conduct was used to support both offenses which had mutually exclusive mental states. O'Neil, 194 Ill. App. 3d at 96.

We note that the corporation in O'Neil was convicted of involuntary manslaughter and its managerial agents were convicted of murder. In the instant case, UPT was convicted of the same offenses as Gutman (vendor fraud and theft) and Lubenskiy (vendor fraud), its high managerial agents. In O'Neil, murder, the offense of which the individual defendants and were convicted, has a different mental state from involuntary manslaughter, the offense of which the corporation was convicted. UPT, Gutman and Lubenskiy were convicted of the same offenses, vendor fraud and theft, and the State proved the same mental state for each offense. 305 ILCS 5/8A-3 (West 2000); 720 ILCS 5/16-1(a)(1)(A) (West 2000). Therefore, we find the facts in O'Neil are distinguishable from the facts in the instant case.

UPT also argues that the State's case against it was weakened by the "inherent credibility issues" of Lubenskiy, the State's main witness. However, the trier of fact is responsible for determining the weight to be given to the witnesses' testimony, determining the witnesses' credibility, resolving conflicts in the evidence, and drawing reasonable inferences from the testimony. Sutherland, 223 Ill. 2d at 242, citing Milka, 211 Ill. 2d at 178, and Evans, 209 Ill. 2d at 211. The record establishes that the trier of fact was aware of Lubenskiy's admitted participation in the illegal activities in this case, but the trier of fact found Lubenskiy to be a credible witness. Therefore, this court will not substitute its judgment for that of the trial court. Sutherland, 223 Ill. 2d at 242, citing Collins, 214 Ill. 2d at 217.

### Financial Records Admitted Under the Business Records Exception

Next, UPT contends that the trial court erred in admitting financial records under the business records exception because there was an insufficient foundation laid for their admission and the bulk

of relevant underlying records had been voluntarily destroyed by the State of Illinois. Specifically, UPT contends that the trial court erred in granting the State's request to admit People's exhibits 133D through G, 136 through140, 143 through 46, 149 through 50, 155, and 157 through 60.

Section 115-5(a) of the Code of Criminal Procedure of 1963, commonly referred to as the business records exception to the hearsay rule, provides that "[a]ny writing or record *** made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter." 725 ILCS 5/115-5(a) (West 2006). Section 115-5(c)(2) of the Code of Criminal Procedure of 1963 further provides that "[n]o writing or record made in the regular course of any business shall become admissible as evidence *** if *** [s]uch writing or record has been made by anyone during an investigation of an alleged offense or during any investigation relating to pending or anticipated litigation of any kind." 725 ILCS 5/115-5(c)(2) (West 2006); see also People v. McClanahan, 191 Ill. 2d 127, 133 (2000). Summaries of voluminous documents are admissible where the underlying data upon which the summary is based are kept and satisfies the ordinary business exception, and  the contents of the voluminous writings cannot conveniently be examined in court. People v. Wiesneske, 234 Ill. App. 3d 29, 41 (1992).

The party seeking to admit a purported business record into evidence must lay an adequate foundation for the business record, including "a showing that the record was made as a memorandum or record of the act; the record was made in the regular course of business; and that it was the regular

course of the business to make such a record at the time of the act or within a reasonable time thereafter." People v. Morrow, 256 Ill. App. 3d 392, 397 (1993), citing People v. Tsombanidis, 235 Ill. App. 3d 823, 835 (1992). "In the case of computer-generated records, a proper foundation additionally requires a showing that: standard equipment was used; the particular computer generates accurate records when used appropriately; the computer was used appropriately; and the sources of the information, the method of recording utilized, and the time of preparation indicate that the record is trustworthy and should be admitted into evidence." Morrow, 256 Ill. App. 3d at 397, citing Riley v. Jones Brothers Construction Co., 198 Ill. App. 3d 822, 829 (1990); M. Graham, Cleary & Graham's Handbook of Illinois Evidence §803.10, at 654-55 (5th ed. 1990). Opposing counsel may object if the evidence presented fails to support introduction of the evidence being offered or lacks a sufficient foundation to be admitted. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence, §611.18, at 546 (7th ed. 1999). "Like other evidentiary rulings, the determination of whether or not business records are admissible is within the sound discretion of the trial judge, and such determinations will not be reversed absent an abuse of discretion." Morrow, 256 Ill. App. 3d at 396, citing Tsombanidis, 235 Ill. App. 3d at 833; People v. Boclair, 129 Ill. 2d 458, 476-77 (1989).

We note that, other than referencing the pages in the record where UPT generally objected to the admission of unspecified exhibits in the record, UPT (1) fails to cite to the page in the record where the exhibits were initially introduced at trial; (2) fails to cite to the page in the record where witnesses identified and discussed the exhibits it mentions in its brief; (3) fails to cite to the page in the record where witnesses allegedly testified that the exhibits it mentions in its brief were prepared solely for litigation purposes; and (4) fails to cite to the page in the record where UPT allegedly

objected to the admission of the exhibits it mentions in its brief on the basis of an improper foundation. Because UPT failed to cite to the pages in the record where the witnesses discussed the exhibits and where UPT made its objections, this court is unable to determine whether a proper foundation was laid for the exhibits: (1) whether the exhibits were business records that were made as a memorandum or record of the act, (2) whether the exhibits were business records that were made in the regular course of business, and (3) whether the exhibits were business records that were created in the regular course of the business at the time of the act or within a reasonable time thereafter. See Morrow, 256 Ill. App. 3d at 397, citing Tsombanidis, 235 Ill. App. 3d at 835. Similarly, because UPT failed to cite to the pages in the record where the witnesses discussed the exhibits, this court is unable to determine whether a proper foundation was laid for the computer records: (1) whether standard computer equipment was used, (2) whether the computer generated accurate records when used appropriately, (3) whether the computer was used appropriately, and (4) whether the record is trustworthy and should be admitted into evidence. Morrow, 256 Ill. App. 3d at 397, citing Riley, 198 Ill. App. 3d at 829.

Supreme Court Rule 341(h)(7) provides that the appellant's brief shall include an argument containing the appellant's contentions, the reasons therefor, citation of the authorities, and the pages of the record relied on. 210 Ill. 2d R. 341(h)(7). Supreme Court Rule 341(h)(7) further provides that points not argued are waived. 210 Ill. 2d R. 341(h)(7). We find that, by failing to cite to the page in the record relied upon in support of the contentions in its brief as required by Rule 341(h)(7), UPT forfeited its issue that the trial court erred when it admitted various exhibits pursuant to the business records exception. 210 Ill. 2d Rs. 341(h)(6), (h)(7). "A reviewing court is entitled to have issues

clearly defined with pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research [citation]; it is neither the function nor the obligation of this court to act as an advocate or search the record for error [Citation]." Obert v. Saville, 253 Ill. App. 3d 677, 682 (1993). We also note that this was a bench trial and we must presume that the trial court judge would not have admitted the exhibits if a proper foundation had not been laid by the state. See People v. Gaultney, 174 Ill. 2d 410, 420 (1996), citing People v. Terrell, 132 Ill. 2d 178, 219 (1989) ("We ordinarily presume that the trial judge knows and follows the law unless the record indicates otherwise"). Accordingly, we hold that the trial court did not abuse it discretion when it admitted the exhibits that the defendant complains about in this appeal.

Restitution

Finally, UPT contends that the trial court erred in ordering it to pay $2,966,187.38 in restitution. Specifically, UPT contends that the trial court erred in adopting a strict liability approach, failed to require the State to prove the actual amount of loss, and failed to reduce the restitution by the amount of legitimate services provided by UPT.

In the instant case, because we vacated UPT's money laundering conviction, this court is unable to determine what portion of the restitution order or the order for fines is based upon the money laundering conviction and what portion of the orders is based upon the theft and vendor fraud convictions. In light of the fact we are unable to determine what portion of the restitution order and the order for fines is attributable to the vacated money laundering conviction, we vacate the order for fines and the order for restitution. See 730 ILCS 5/5-5-6 (West 2000).

CONCLUSION

In conclusion, we find that the State proved UPT guilty of vendor fraud and theft beyond a reasonable doubt. However, we vacate UPT's money laundering conviction because it was based upon Gutman's money laundering conviction, which was vacated by this court. We find that the evidence was sufficient to convict UPT of money laundering, but a new trial is required to correct the trial court's error of assessing the evidence on the money laundering charge. People v. Davis, 377 Ill. App. 3d 735, 747 (2007), citing People v. Taylor, 76 Ill. 2d 289, 309 (1979); People v. Hampton, 363 Ill. App. 3d 293, 301 (2005). Therefore, we affirm UPT's vendor fraud and theft convictions but vacate UPT's money laundering conviction, and we remand for a new trial and resentencing.

Affirmed in part and vacated in part; cause remanded for further proceedings consistent with this opinion.

O'BRIEN, J., and GALLAGHER, J., concur.