Fourth Division
March 31, 2010

No. 1-08-1379

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 04 CR 2262 |
| | ) | |
| | ) | |
| IRIT GUTMAN, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE NEVILLE delivered the opinion of the court:

The defendant, Irit Gutman, was convicted, following a bench trial, of vendor fraud (305 ILCS 5/8A-3 (West 2000)), theft (720 ILCS 5/16-1 (West 2000)), and money laundering (720 ILCS 5/29B-1 (West 2000)). The trial court sentenced her to 66 months' imprisonment and ordered her to pay $1.2 million in restitution. On appeal, Gutman presents the following issues for our review: (1) whether the trial court erred where evidence of Universal Public Transportation Inc.'s (UPT) receipts rather than its profits was used to convict her of money laundering; (2) whether the State knowingly used perjured testimony; (3) whether she was denied the effective assistance of counsel; and (4) whether the State proved her guilty beyond a reasonable doubt. The State responds that this court lacks jurisdiction over Gutman's appeal. For the following reasons, we affirm in part and reverse in part.

BACKGROUND

On January 20, 2004, Gutman, Mike Tishel, Ilya Lubenskiy, and UPT were each charged with vendor fraud, theft, and money laundering. Lubenskiy entered into a plea agreement with the State and pled guilty to vendor fraud in exchange for his testimony against Gutman, Tishel, and UPT. On April 25, 2005, Gutman requested a severance, which the trial court granted. In simultaneous but severed bench trials, the trial court heard the evidence presented against Gutman, Tishel, and UPT.

The State's Case

Lubenskiy testified that he pled guilty to forgery and mail fraud in federal court in 2003 and pled guilty in the instant case in 2004 and agreed to testify truthfully for the State. Lubenskiy explained the "prior approval system" used by the State of Illinois for the Medicaid program from the late 1990s until June 2001. Specifically, Lubenskiy testified that recipients in need of transportation to medical services called the local public aid office and requested transportation. The public aid office called a transportation company, informed the transportation company when and where the transportation company was supposed to provide the service, and the transportation company provided the service. A few months later, the public aid office would send the transportation company a copy of the prior approval number. The transportation company would then submit a bill and eventually be paid.

Lubenskiy met Gutman in 1993 when they worked for A.K. Medical Transportation Company (A.K.). In 1995, he and Gutman opened Egra Medical Transportation. Gutman spoke with the recipients and the public aid office, and Lubenskiy performed the bookkeeping. By 1999,

Lubenskiy and Gutman co-owned additional companies, all of which were located in the same office space.

In February or March of 1999, Gutman told Lubenskiy that the public aid office had sent her a prior approval form with an incorrect code. The person from the public aid office instructed Gutman to delete the incorrect code and insert the correct code. Gutman told Lubenskiy that they should make changes on other prior approval forms. For example, in order to increase their payments, Gutman suggested that they could alter the destination, alter the number of miles traveled, or change the category of service. Gutman also suggested that they order blank prior approval forms, rewrite the forms, and insert any destination or number of trips on the forms. At Gutman's suggestion, Lubenskiy sent a bill in excess of the amount to which UPT was entitled to the public aid office for which they were eventually paid.

Lubenskiy identified exhibit 129 as the December 1, 1999, agreement between Lubenskiy, Gutman, and the federal government in which he and Gutman agreed to be permanently barred from participating in the Medicare program, all other federal healthcare programs, and the Illinois Medical Assistance Program. After they signed the agreement, Lubenskiy told Gutman that they had to sell the companies because their accounts were frozen as a result of their agreement. Gutman suggested that they rename the company and find a third partner. In December 2000, Lubenskiy and Gutman met with Tishel. Gutman offered Tishel 50% of the company and explained that she and Lubenskiy would run the company and Tishel would receive a salary. Lubenskiy testified that because he and Gutman were barred from participating in the Medicaid programs, Tishel was supposed to appear as the sole owner of the company. According to Lubenskiy, Tishel said it would only be fair if he

owned one-third, rather than half, of the company.

UPT commenced doing business on January 16, 2001. Except for the name change, the business remained the same: they had the same vehicles, the same drivers, the same employees and the same office space. Gutman continued to talk with the public aid office using an alias, Lubenskiy continued to perform the bookkeeping, and Tishel signed and deposited checks received from the State of Illinois into a bank account on which only Tishel and his son were the authorized signatories.

Lubenskiy further testified that money was transferred from UPT's business account to Tishel's personal account and from Tishel's personal account to Gutman's account. The money issued to Gutman's account was used to purchase single-family homes that were put in Gutman's name. However, Lubenskiy testified that he did not receive half of the property as agreed. Lubenskiy identified exhibit 130 as a trustee's deed dated January 29, 1998, for property in Galena owned by him and Gutman. Lubenskiy identified exhibit 131 as a quitclaim deed dated May 10, 2000, bearing his and Gutman's names transferring the Galena property to Gutman's son. Lubenskiy explained that they were attempting to hide the property. Lubenskiy identified exhibit 132 as a mortgage for $224,000 on the Galena property recorded February 26, 2001. Lubenskiy identified exhibit 53 as a check from the title company dated February 26, 2001, in the amount of $216,720.50. Lubenskiy identified exhibit 54 as a deposit ticket for UPT's account in the amount of $216,720.50.

Lubenskiy further testified that he and Gutman purchased cars with funds from UPT. Lubenskiy identified exhibit 61 as an invoice for a Mercedes owned by him and Gutman and used by Gutman. Lubenskiy identified exhibit 62 as a receipt dated March 13, 2002, for another Mercedes

owned by Gutman and Ezra Entertainment that he used. Lubenskiy testified that from January 16, 2001, until February 2002, UPT billed the State of Illinois approximately $6 million and received approximately $3 million. Finally, Lubenskiy testified that they eventually sold the business to Arik Amzaleg and Tishel for $600,000, but only received $400,000.

On cross-examination, Lubenskiy testified that he was banned as a result of activities that occurred between July 1995 and September 1999. On August 22, 2003, he pled guilty and on December 12, 2003, was sentenced to 33 months' imprisonment in a federal penitentiary. Around the same time, he was found guilty of forgery in state court. The federal and state sentences were to run concurrently.

Lubenskiy further testified on cross-examination that he only spoke with Tishel, not Amzaleg. Lubenskiy also denied having a conversation with Amzaleg in which they discussed the following: that there were discrepancies in the bookkeeping, that the consulting fee of $600,000 was to pay a previous front man, that they altered the mileage reimbursement procedure, that they billed four transportation companies for the same transport, that Lubenskiy hired women to create false documentation, that Lubenskiy created bills inclusive of kickbacks, and that Lubenskiy told Amzaleg that he slept well because he had taken $7 million. On redirect examination, Lubenskiy testified that Tishel never paid for his share of the business and that Tishel was listed as the sole, not one-third, owner of UPT.

Alla Denisenkio testified that she has known Lubenskiy and Gutman since 1999 when she worked for Ezra. She has also worked for other medical transportation companies owned by Lubenskiy and Gutman, including Tamid Medical Transportation, A.K., Purple Heart, and Etza. In

January 2001, when the company changed its name to UPT, everything in the business remained the same except that Lubenskiy stopped coming into the office. Gutman informed Denisenkio that Tishel was the new owner and that he would sign the paychecks.

Ilona Golshmit testified that she has known Lubenskiy and Gutman since 1998 when she worked for Ezra. The company had several names at various points in time: Ezta, A.K., Purple Heart, and UPT. Gutman and Lubenskiy owned all of the companies except for UPT, which was owned by Tishel. Regardless of the name of the company, the daily operations remained the same: same drivers, same vehicles, same employees, and same job responsibilities.

John Fingley testified that he is the fraud and abuse executive for the office of the Inspector General with the Illinois Department of Health Care and Family Services (Department of Health Care). The Department of Health Care was previously called the Illinois Department of Public Aid. The office of the Inspector General is charged with program integrity for the medical assistance program of the State of Illinois. The medical assistance program, or Medicaid, is run by the federal government and gives medical services to the poor and indigent without health insurance. The program reimburses transportation companies for transporting the recipients. The transportation companies have to sign a provider agreement certifying that they will adhere to the Department of Health Care's rules and regulations.

Fingley testified that UPT was a provider in the medical assistance program from January 2001 until February 2002, and that Tishel was listed in the provider agreement as the sole owner of UPT. Pursuant to settlement agreements, Gutman and Lubenskiy were permanently barred from participating in the medical assistance program. Specifically, neither of them was allowed to be a

vendor or provider in the medical assistance program or assume management responsibilities of a vendor or provider. They could not directly or indirectly own 5% or more of a corporate vendor or provider, they could not order goods or services from a provider, and they could not render goods or services as an employee of a vendor.

Virma Rodriguez testified that she was an auditor for the Illinois State Police, Illinois Department of Public Aid, who are now called the Illinois Department of Health Care and Family Services, and audited the billing practices of Medicaid providers, including UPT. She identified group exhibit 133 as a box she obtained from the local public aid office which contained prior approval forms for UPT created by the public aid office. She testified that she pulled from the box all prior approval numbers for UPT from January 2001 to February 2002. She identified exhibit 151 as a list of the prior approval numbers she gathered for UPT. Rodriguez testified that she then sent the list of prior approval numbers to Debbie Helms, the manager of the claims processing unit, so that Helms could give Rodriguez all of the billings paid to UPT for each prior approval number. Rodriguez identified exhibit 154 as a certified copy of the spreadsheet Helms sent to her. Rodriguez identified exhibit 152 as the spreadsheet she created by compiling all of the information she had available to her. Rodriguez explained that she took the recipient's name, identification number, and service date from Helms's spreadsheet and compared the information to the recipient's information from the prior approval numbers. If the recipient's name, identification number or service date did not match on the two spreadsheets, Rodriguez considered it to be a false billing. Rodriguez testified that $67,798.18 of the $71,280.40 UPT billed the State of Illinois were false billings.

Rodriguez identified exhibit 156 as a certified copy of Helms's spreadsheet regarding

mileage to and from certain addresses from January 2001 until February 2002. Rodriguez identified exhibit 153 as her spreadsheet containing the service dates, recipient's number, originating place, destination code, actual miles, and submitted miles. After subtracting the miles that should have been paid[1] from the miles that were actually paid, Rodriguez determined that UPT overbilled the State of Illinois by $176,336.25.

Arik Amzaleg testified that he met Gutman and Lubenskiy in 1999 or 2000 when a business broker again approached him about purchasing their business. He declined the offer. In December 2001, the broker approached him about purchasing UPT. Tishel told Amzaleg that he owned UPT on paper, but that two other people, whom Amzaleg identified as Gutman and Lubenskiy, were involved in the business. Tishel explained that 50% of the company was for sale because the people who supported Tishel's ownership wanted to sell their portion of the business. Tishel told Amzaleg that the business made $800,000 per year and each party took home $30,000 a month. Amzaleg testified that he attended a closing for UPT on February 27, 2002. He and Tishel co-owned the company. On February 28, 2002, he was present when Tishel obtained a cashier's check payable to Gutman and gave it to Lubenskiy.

On cross-examination, Amzaleg testified that in November 2003, officials from the Attorney General's office questioned him to determine if UPT, then known as Universal Star Transportation, was billing public aid for amounts in excess of what the company was entitled. Amzaleg

---

[1]The parties stipulated to, among other things, the mileage for various trips according to Mapquest.

remembered telling the officials that, prior to purchasing UPT, he reviewed UPT's financial statements and observed high consulting fees, extremely high profits, and high vehicle maintenance fees. Amzaleg testified that when UPT was going to be audited, Lubenskiy hired women to create false documentation. Amzaleg further testified that the garage where the company vehicles were serviced created bills that included a kickback for the owner of the garage and the mechanic. Lubenskiy would write a check to the garage for an amount that exceeded the amount of the inflated bill and keep the additional funds. When Amzaleg asked Lubenskiy how he slept at night, Lubenskiy responded that he slept well after taking $7 million. Lubenskiy said that if the business was run legitimately, there would be a 20% to 25% decrease in income. After Tishel and Amzaleg agreed to purchase UPT for $600,000, Tishel asked Lubenskiy if a partial payment of $400,000 would be sufficient. Tishel explained that any outstanding public aid payments that the new company received would go toward the outstanding $200,000 owed for the new business. Lubenskiy responded by screaming at Tishel

Steven Bradley testified that he is the Bureau Chief for the Bureau of Comprehensive Health Services, Division of Medical Programs, Department of Health Care and Family Services. In the medical assistance program, a base trip includes picking up a patient and delivering him or her from point A to point B. The first 10 miles of a trip is included in the fee for a base trip, but any mileage over the initial 10 miles is reimbursed on a per-mile basis. If a transportation provider submits a claim electronically, the claim passes through a series of computer validation checks to verify that the provider was an eligible provider, that the patient was eligible for medical assistance on the day of service, that the codes billed were in effect on the day of service, and that the forms were filled

out correctly. Once the computer determines that the claim is payable, it is assigned a voucher number and is sent to the comptroller's office for payment. The check is mailed to the payee at the address listed on the application for participation. During the time in question, the computer did not validate prior approval numbers.

Bradley further testified that UPT was a provider in the medical assistance program from January 2001 until March 2002. Bradley identified exhibit 143 as the enrollment application for UPT, which was signed by Tishel and dated January 16, 2001. Bradley identified exhibit 144 as a copy of the agreement for participation, stating that Tishel was the sole owner of UPT.

Debbie Helms testified that she is the data control manager at the Illinois Department of Health Care and Family Services. She processes medical claims, including billing claims for transportation companies. She identified exhibit 154 as a copy of the spreadsheet she created for payment to UPT for certain prior approval numbers provided by Rodriguez. She identified exhibit 155 as a document she created that summarized the trips made by UPT. The total payments to UPT from January 1, 2001, through February 28, 2002, were $71,280.40. She identified exhibit 156 as a document she prepared stating that UPT was paid $235,106.01 for mileage. Helms testified that from January 1, 2001, until February 28, 2002, UPT billed the State of Illinois $2,971,146.42, but the State of Illinois only paid UPT $2,966,187.38. After the State rested its case, Gutman made a motion for a directed finding and the trial court denied Gutman's motion.

Gutman's Case

Nicholas Cozzolino testified that he is an investigator with the Illinois State Police, Medical Fraud Unit. On November 19, 2003, he interviewed Amzaleg. According to Cozzolino, Amzaleg

made the following statement. In 2001, he was approached with information regarding a medical transportation company, UPT, that was for sale. Amzaleg was introduced to Tishel, the alleged owner of UPT. Tishel informed Amzaleg that he was only a front for the business and that Lubenskiy was the true owner. In return for being the front for the business, Lubenskiy and Gutman promised Tishel a new Mercedes every year and a yearly salary. Amzaleg observed discrepancies in the financial statements, including high consulting fees, extremely high profits, and high vehicle maintenance fees. Amzaleg said that Lubenskiy admitted that he altered the mileage in order to increase profits and that he billed public aid under four different companies for the same transport. Amzaleg said that Lubenskiy hired women to create false documentation. Amzaleg also said that Lubenskiy said that the vehicle maintenance for the business's vehicles was performed at a garage where the owner of the garage created bills inclusive of a kickback for himself and a mechanic, and that Lubenskiy would write a check that exceeded the amount in the mechanic's bill in order to get cash back. Amzaleg asked Lubenskiy how he slept at night, and Lubenskiy responded, "[w]hen you take $7 million, you can sleep very good." Amzaleg said that Lubenskiy said that 30% to 40% of the business was not legitimate.

Cozzolino further testified that Amzaleg stated that he met with Tishel and Lubenskiy on February 27, 2002, in order to purchase the business. Lubenskiy requested a cashier's check in Gutman's name. Tishel asked Lubenskiy if a partial payment of $400,000 would suffice and the remaining $200,000 of the purchase price would be used to start the business. Tishel also asked Lubenskiy if the first payment from public aid could be used to pay the unpaid purchase price. Amzaleg told Cozzolino that Lubenskiy got upset and demanded a guarantee for the unpaid purchase

price. Finally, on April 18, 2007, at the conclusion of Gutman's case, the trial court found Gutman guilty of vendor fraud, theft, and money laundering.

Posttrial Proceedings

On October 18, 2007, Gutman filed a motion for a new trial. On October 18, 2007, the trial court (1) denied Gutman's motion for a new trial, (2) merged the vendor fraud and theft counts, (3) sentenced Gutman to 66 months' imprisonment, and (4) ordered Gutman to pay $2 million in restitution. The trial court scheduled November 16, 2007, for additional posttrial motions.

On November 6, 2007, Gutman filed a motion to advance the November 16, 2007, date. The half sheet indicates that the trial court granted the motion. The half sheet further indicates that the filing period was extended and that the next motion date was December 10, 2007.

On December 10, 2007, the trial court held a hearing. Gutman's trial lawyer withdrew from the case, and attorney Gal Pissetzky requested leave to file his appearance. Pissetzky informed the court that he intended to file a postsentencing motion and requested 30 days to do so. The trial court granted him until January 11, 2008, to file the motion.

On January 11, 2008, Gutman tendered a motion to reduce the sentence and requested a status date of February 11, 2008, which the court permitted. On January 21, 2008, Gutman filed a motion to reconsider the sentence and modify the restitution order. On February 11, 2008, Gutman informed the court that she had filed her posttrial motions, but requested a status date of March 10, 2008, which was granted by the trial court. On March 10, 2008, Gutman requested a continuance for her motion to reconsider the sentence, and it was granted by the trial court.

On March 20, 2008, the trial court heard the parties' arguments on Gutman's motion to

reconsider the sentence and to modify the restitution order, and denied Gutman's motion to reduce her sentence but stated that it would consider a reduction in her fines. On May 2, 2008, the trial court heard arguments on Gutman's motion to modify the restitution order. Both parties made arguments regarding the proper amount of restitution owed. The trial court granted the motion and ordered Gutman to pay $1.2 million in restitution. On May 15, 2008, Gutman filed a notice of appeal.

ANALYSIS

Jurisdiction

The State argues that this court lacks jurisdiction over Gutman's appeal because the notice of appeal was not filed, as required by Supreme Court Rule 606(b) (210 Ill. 2d. R. 606(b)), within 30 days after the entry of an order rejecting a timely postjudgment motion. The State further argues that the trial court had no authority to grant Gutman's request to extend the time for filing postjudgment motions. Gutman argues that the trial court was permitted to extend the time for filing postjudgment motions or, alternatively, that the trial court was revested with jurisdiction pursuant to the revestment doctrine.

Supreme Court Rule 606(b) provides that "the notice of appeal must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed from or if a motion directed against the judgment is timely filed, within 30 days after the entry of the order disposing of the motion." 210 Ill. 2d R. 606(b). The sentence is the final judgment in a criminal case. People v. Partee, 125 Ill. 2d 24, 32 (1988), citing People v. Allen, 71 Ill. 2d 378, 381 (1978).

In the instant case, the trial court found Gutman guilty on April 18, 2007. On October 18,

2007, the trial court denied Gutman's motion for a new trial, sentenced her to 66 months' imprisonment and ordered her to pay $2 million in restitution. Pursuant to Rule 606(b), Gutman had 30 days, or until November 19, 2007, to file either a notice of appeal or a motion directed against the sentence, which is the final judgment in a criminal case. 210 Ill. 2d R. 606(b); see also Partee, 125 Ill. 2d at 32, citing Allen, 71 Ill. 2d at 381. Gutman did not file her motion to reduce the sentence until January 21, 2008, or her notice of appeal until May 15, 2008. Therefore, Gutman's postjudgment motion and notice of appeal were filed after the expiration of the 30-day period prescribed by Rule 606(b). 210 Ill. 2d R. 606(b).

Gutman contends, however, that this court has jurisdiction to hear this appeal pursuant to the revestment doctrine. The State argues that it did not consent to setting aside the judgment and that the hearing on the motion to reconsider was not inconsistent with the prior judgment.

"Under the revestment doctrine, litigants may revest a trial court with personal and subject matter jurisdiction, after the 30-day period following final judgment, if they actively participate in proceedings that are inconsistent with the merits of the prior judgment." People v. Bannister, 263 Ill. 2d (2009), citing People v. Minniti, 373 Ill. App. 3d 55, 65 (2007), citing People v. Kaeding, 98 Ill. 2d 237, 240-41 (1983); People v. Henry, 329 Ill. App. 3d 397, 403 (2001). "Revestment applies when the parties (1) actively participate without objection (2) in further proceedings that are inconsistent with the merits of the prior judgment." Minniti, 373 Ill. App. 3d at 65, citing Kaeding, 98 Ill. 2d at 241; Ridgely v. Central Pipe Line Co., 409 Ill. 46, 50 (1951). "A party's conduct may be considered inconsistent with a prior order 'if the conduct reasonably can be construed as an indication that the parties do not view the prior order as final and binding.' " Wierzbicki v. Gleason,

388 Ill. App. 3d 921, 928 (2009), quoting <u>Djikas v. Grafft</u>, 344 Ill. App. 3d 1, 12 (2003). "If a trial court is revested with jurisdiction, then a notice of appeal filed within 30 days after a ruling on the untimely postjudgment motion vests the appellate court with jurisdiction." <u>People v. Lindmark</u>, 381 Ill. App. 3d 638, 652 (2008), citing <u>Minniti</u>, 373 Ill. App. 3d at 67.

In the instant case, the State concedes that it did not object to extending the time for Gutman to file a postsentencing motion. The record reveals that the State participated in the sentencing hearing on October 18, 2007. On November 6, 2007, Gutman filed a motion to advance the November 16, 2007, hearing date, and the half sheet indicates that the trial court granted the motion. The half sheet does not indicate that the trial court granted the motion to advance the date over the State's objection. On December 10, 2007, Gutman requested 30 days to file a postsentencing motion, and the State did not object. On January 11, 2008, Gutman tendered a motion to reduce the sentence and requested a status date of February 11, 2008, which the trial court granted with the State's agreement. On January 21, 2008, Gutman filed a motion to reconsider the sentence and to modify the restitution order. On February 11, 2008, Gutman requested a status date of March 10, 2008, which the trial court granted with the State's agreement. On March 10, 2008, Gutman requested a continuance on her motion to reconsider the sentence, which the trial court granted with the State's agreement. On March 20, 2008, after hearing the parties' arguments, the trial court denied Gutman's motion to reconsider the sentence, but stated that it would reconsider the amount of restitution owed. On May 2, 2008, the trial court conducted a hearing on Gutman's motion to modify the restitution order, and both parties participated and made arguments as to the amount of restitution owed. By participating in and not objecting to a hearing on an untimely motion to

reconsider the sentence, the State's acts were inconsistent with the validity of the prior judgment. See Lindmark, 381 Ill. App. 3d at 652, citing Minniti, 373 Ill. App. 3d at 67, citing People v. Gargani, 371 Ill. App. 3d 729, 732 (2007). Therefore, we find that the parties revested the trial court with jurisdiction by participating in and not objecting to the hearing on the untimely motion to reconsider the sentence. Accordingly, because Gutman filed a notice of appeal on May 15, 2008, within 30 days after the trial court entered its May 2, 2008, order on the untimely motion to reconsider sentence and reduce restitution, we find that this court has jurisdiction over the appeal. 210 Ill. 2d R. 606(b).

Receipts or Profits

Gutman contends that her conviction for money laundering must be reversed because the trial court used evidence of the "gross receipts" of the financial transactions with the State of Illinois rather than the "proceeds" from those transactions to find her guilty of money laundering. The State argues that Gutman forfeited this issue by failing to object to the meaning of the term "proceeds" in the trial court. The State also argues that the term "proceeds" in the money laundering statute refers to gross receipts, not profits. Finally, the State argues that this court should interpret the term "proceeds" in accord with the dictionary's definition, rather than the definition found in United States v. Santos, 553 U.S. ___, 170 L. Ed. 2d 912, 128 S. Ct. 2020 (2008).

In order to preserve a claim for our review, a defendant must object at trial and raise the issue in a written posttrial motion. People v. Enoch, 122 Ill. 2d 176, 186 (1988). In this case, Gutman failed to object at trial to the State's use of evidence of UPT's alleged receipts from transactions with the State of Illinois and failed to include the issue in a posttrial motion. Accordingly, we find

that Gutman failed to properly preserve this issue for our review and, therefore, it is forfeited. See People v. Blair, 215 Ill. 2d 427, 443-44 (2005) (defining "forfeit" to mean issues that could have been raised, but were not and are therefore barred), citing People v. Rogers, 197 Ill. 2d 216, 221 (2001).

While an issue not properly preserved may be forfeited, this court may review alleged errors not properly preserved when (1) the evidence in a criminal case is closely balanced, or (2) the error is so fundamental, and of such magnitude, that the accused is denied the right to a fair trial. People v. Hudson, 228 Ill. 2d 181, 191 (2008), citing People v. Johnson, 208 Ill. 2d 53, 64 (2003). Finally, before we determine if there was plain error, we must first determine if an error was committed by the trial court. Hudson, 228 Ill. 2d at 191, citing People v. Urdiales, 225 Ill. 2d 354, 415 (2007).

In order to determine if the court erred, we must examine the money laundering statute. Gutman is asking this court to interpret the term "proceeds" in the money laundering statute. Interpreting a term in a statute presents a question of law which this court reviews *de novo*. People v. Hunt, 234 Ill. 2d 49, 59 (2009), citing People v. Christopherson, 231 Ill. 2d 449, 454 (2008).

Section 29B-1(a) of the Code of Criminal Procedure of 1961 (Criminal Code) provides that a person commits the offense of money laundering "when he knowingly engages or attempts to engage in a financial transaction in criminally derived property with either the intent to promote the carrying on of the unlawful activity from which the criminally derived property was obtained or where he knows or reasonably should know that the financial transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the criminally derived property." 720 ILCS 5/29B-1(a) (West 2000). Section 29B-1(b)(4) of the

Criminal Code defines "criminally derived property" as "any property constituting or derived from *proceeds* obtained, directly or indirectly, pursuant to a violation of the Criminal Code of 1961, the Illinois Controlled Substances Act or the Cannabis Control Act." (Emphasis added.) 720 ILCS 5/29B-1(b)(4) (West 2000). Accordingly, we find that the money laundering statute is violated when a person engages in a financial transaction with property derived from proceeds obtained, directly or indirectly, from violating the Criminal Code with the intent to carry on the unlawful activity from which the criminally derived property was obtained or where the person knows or should know that the financial transaction is designed to conceal the location, source, ownership or control of the criminally derived property. 720 ILCS 5/29B-1(a), (b)(4) (West 2000).

We note that section 29B-1 of the Criminal Code does not define the term "proceeds." 720 ILCS 5/29B-1 (West 2000). We also note that the Illinois Supreme Court has not defined the term "proceeds" used in section 29B-1 of the Criminal Code. 720 ILCS 5/29B-1 (West 2000). However, the United States Supreme Court has defined the term "proceeds" in the federal money laundering statute. Santos, 553 U.S. at ___, 170 L. Ed. 2d at 918-20, 128 S. Ct. at 2023-25, citing 18 U.S.C. §1856(a)(1)(A)(I) (2006). In Santos, the defendant was charged with, among other things, two counts of federal money laundering. The issue before the United States Supreme Court was "whether the term 'proceeds' in the federal money-laundering statute, 18 U.S.C. §1956(a)(1), means 'receipts' or 'profits.' " Santos, 553 U.S. at ___, 170 L. Ed. 2d at 917, 128 S. Ct. at 2022. The United States Supreme Court noted that the majority of states with money laundering statutes, including Illinois, use the term "proceeds" in the statute without defining it. Santos, 553 U.S. at ___ n.2, 170 L. Ed. 2d at 919 n.2, 128 S. Ct. at 2024 n.2. The United States Supreme Court found that

the federal money laundering statute does not define the term "proceeds", and that "proceeds" is ambiguous and can mean either "receipts" or "profits." Santos, 553 U.S. at ___, 170 L. Ed. 2d at 918, 128 S. Ct. at 2024. The United States Supreme Court noted that the rule of lenity requires that ambiguous criminal laws be interpreted in favor of the defendants subjected to them. Santos, 553 U.S. at ___, 170 L. Ed. 2d at 920, 128 S. Ct. at 2025, citing United States v. Gradwell, 243 U.S. 476, 485, 61 L. Ed. 857, 864, 37 S. Ct. 407, 410 (1917); McBoyle v. United States, 283 U.S. 25, 27, 75 L. Ed. 816, 818, 51 S. Ct. 340, 341 (1931); United States v. Bass, 404 U.S. 336, 347-49, 30 L. Ed. 2d 488, 496-97, 92 S. Ct. 515, 522-23 (1971). Therefore, the Supreme Court held that "[b]ecause the 'profits' definition of 'proceeds' is always more defendant-friendly than the 'receipts' definition, the rule of lenity dictates that it should be adopted." Santos, 553 U.S. at ___, 170 L. Ed. 2d at 920, 128 S. Ct. at 2025.

In this case, because section 29B-1 of the Criminal Code does not define the term "proceeds," because the Illinois Supreme Court has not defined the term "proceeds" in section 29B-1 of the Criminal Code, and because we also find the term "proceeds" is ambiguous, we follow Santos and hold that the term "proceeds" in section 29B-1 of the Criminal Code means "profits" rather than "receipts." Santos, 553 U.S. at ___, 170 L. Ed. 2d at 920, 128 S. Ct. at 2025; 720 ILCS 5/29B-1 (West 2000).

Here, the money laundering indictment alleged that Gutman "knowingly engaged in a series of financial transactions *** in criminally derived property consisting of *proceeds* obtained from the theft of funds from the State of Illinois." (Emphasis added.) The Court in Santos defined "profits" as "what remains after expenses are paid." Santos, 553 U.S. at ___, 170 L. Ed. 2d at 922, 128 S. Ct.

at 2027. Our review of the record revealed that no evidence relating to UPT's expenses or the profits that remained after expenses for services provided to the State of Illinois were paid was presented during the trial. Rather, the evidence presented during the trial related exclusively to the gross receipts obtained after UPT sent its bills for services to the State of Illinois. Lubenskiy testified that UPT billed the State of Illinois approximately $6 million and received approximately $3 million. Therefore, we find that the trial court erred when it found Gutman guilty of money laundering because the record establishes that the trial court used evidence of UPT's gross receipts from transactions with the State of Illinois rather than UPT's profits to determine whether Gutman violated the money laundering statute. Santos, 553 U.S. at ___, 170 L. Ed. 2d at 920, 128 S. Ct. at 2024.

We also find that the trial court's use of evidence of UPT's gross receipts from transactions with the State of Illinois rather than evidence of UPT's profits to find Gutman guilty of money laundering was a fundamental error that denied Gutman a fair trial on the money laundering charge. Hudson, 228 Ill. 2d at 191, citing Johnson, 208 Ill. 2d at 64. Accordingly, we vacate Gutman's money laundering conviction. See Santos, 553 U.S. at ___, 170 L. Ed. 2d at 918, 926, 128 S. Ct. at 2023, 2031 (affirming the Court of Appeals' affirmance of the district court's vacation of the federal money laundering conviction where there was no evidence that the transactions on which the money laundering convictions were based involved profits, as opposed to receipts of the illegal enterprise).

The State argues that this court should consult a dictionary to define the term proceeds because section 29B-1 of the Criminal Code does not define the term "proceeds". This court, however, need not consult a dictionary when the United States Supreme Court has defined the term

"proceeds" in the federal money laundering statute[2] which is similar to Illinois's money laundering statute.[3] Santos, 553 U.S. at ___, 170 L. Ed. 2d at 920, 128 S. Ct. at 2025; 18 U.S.C. §1956(a)(1) (2006).

---

[2]See 18 U.S.C. §1956(a)(1)(A)(I) (2006)(the federal money laundering statute provides "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity *** (A)(i) with the intent to promote the carrying on of specified unlawful activity *** shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both").

[3]See 720 ILCS 5/29B-1(a) (West 2000) (the Illinois money laundering statute provides that a person commits the offense of money laundering "when he knowingly engages or attempts to engage in a financial transaction in criminally derived property with either the intent to promote the carrying on of the unlawful activity from which the criminally derived property was obtained or where he knows or reasonably should know that the financial transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the criminally derived property"); 720 ILCS 5/29B-1(b)(4) (West 2000) (the statute defines "criminally derived property" as "property constituting or derived from proceeds obtained, directly or indirectly, pursuant to a violation of the Criminal Code of 1961, the Illinois Controlled Substances Act or the Cannabis Control Act").

The State also argues that adverse consequences would result from interpreting the term "proceeds" to mean "net profits" and, therefore, the legislature must have intended "proceeds" to mean "gross receipts." Specifically, the State argues that the purpose of the money laundering statute is to prevent criminals from engaging in a wide variety of financial transactions and that construing "proceeds" to reflect the gross receipts of a criminal activity furthers that objective because gross receipts accurately reflect the scale of the criminal activity.

We note that the legislature elected not to define the term "proceeds" in section 29B-1 of the Criminal Code. As the United States Supreme Court in Santos noted, the term "proceeds" is ambiguous, and therefore the rule of lenity requires this court to construe the ambiguous and undefined term in favor of the defendant. Santos, 553 U.S. at ___, 170 L. Ed. 2d at 920, 128 S. Ct. at 2025. The rule of lenity is also followed by Illinois courts. See People v. Jones, 223 Ill. 2d 569, 581 (2006) (noting that the rule of lenity requires that any ambiguity in a criminal statute be resolved in a manner which favors the accused), citing People v. Davis, 199 Ill. 2d 130, 140 (2002), citing People ex rel. Gibson v. Cannon, 65 Ill. 2d 366, 370-71 (1976); see also People v. Williams, 393 Ill. App. 3d 77, 86-87 (2009), citing Santos, 553 U.S. at ___, 170 L. Ed. 2d at 920, 128 S. Ct. at 2025 (same), and People v. Grever, 222 Ill. 2d 321, 338 (2006), citing People v. Christensen, 102 Ill. 2d 321, 328 (1984) ("We strictly construe criminal statutes in favor of the accused"). Therefore, because we find the term "proceeds" in the Illinois money laundering statute to be ambiguous, we will also follow the rule of lenity. See Jones, 223 Ill. 2d at 581, citing Davis, 199 Ill. 2d at 140, citing Cannon, 65 Ill. 2d at 370-71; see also Williams, 393 Ill. App. 3d at 86-87, citing Santos, 553 U.S. at ___, 170 L. Ed. 2d at 920, 128 S. Ct. at 2025, and Grever, 222 Ill. 2d at 338, citing

1-08-1379

Christensen, 102 Ill. 2d at 328.

The State further argues that interpreting "proceeds" to mean "profits" would impose unreasonable burdens on prosecutors attempting to enforce the money laundering statute. In Santos, the United States Supreme Court rejected a similar argument that money laundering would be more difficult to prosecute if "proceeds" were defined as "profits." Santos, 553 U.S. at ___, 170 L. Ed. 2d at 924, 128 S. Ct. at 2029. Specifically, the United States Supreme Court in Santos found that, in order to establish the proceeds element under the "profits" interpretation, the prosecution need only show that a single instance of specified unlawful activity was profitable and gave rise to the money involved in a charged transaction. Santos, 553 U.S. at ___, 170 L. Ed. 2d at 924, 128 S. Ct. at 2029. The United States Supreme Court in Santos further noted that, in doing so, the government could select the instances for which the profitability was clearest. Santos, 553 U.S. at ___, 170 L. Ed. 2d at 924, 128 S. Ct. at 2029. Therefore, like Santos, we reject the State's argument that interpreting "proceeds" to mean "profits" would impose unreasonable burdens on the prosecution.

Finally, the State argues that the legislature has used the term "proceeds" in a number of other statutes providing that the defendant shall forfeit "profits or proceeds," thus indicating that "profits" and "proceeds" are distinct. See 720 ILCS 5/10A-15(a) (West 2008) (voluntary servitude, involuntary servitude of a minor, or trafficking of persons for forced labor or services); 720 ILCS 5/11-20.1A(a)(1) (West 2008) (keeping a place of juvenile prostitution, exploitation of a child, or child pornography); 720 ILCS 5/16D-6 (West 2008) (computer fraud); 720 ILCS 5/29D-65(b)(1) (West 2008) (terrorism); 720 ILCS 5/37.5-10 (West 2008) (animals in entertainment; dogfighting); 725 ILCS 175/5(a) (West 2008) (narcotics racketeering). We note that the statutes cited by the State

- 23 -

do not contain a definition for the term "proceeds"; therefore, the statutes do not help our analysis. Furthermore, neither the Criminal Code nor the Illinois Supreme Court has defined the term "proceeds" in the money laundering statute. Accordingly, we will follow Santos and adopt the United State Supreme Court's definition of the term "proceeds." Santos, 553 U.S. at ___, 170 L. Ed. 2d at 920, 128 S. Ct. at 2025.

Perjured Testimony

Next, Gutman contends that her convictions must be reversed where the State knowingly used perjured testimony and allowed the false testimony to stand uncorrected. Specifically, Gutman contends that Lubenskiy's testimony at trial conflicted with information provided in the State's motion for a restraining order. The State responds that the prosecutor was not obligated to correct the testimony because it was not false.

The State also contends that Gutman forfeited this argument because she failed to object to the testimony at trial or include the issue in a posttrial motion. As noted above, in order to preserve this claim for our review, a defendant must object at trial and in a written posttrial motion. Enoch, 122 Ill. 2d at 186. In this case, Gutman acknowledges that she neither objected to the alleged false testimony at trial nor included the issue in a posttrial motion. Accordingly, we find that Gutman failed to properly preserve this issue for our review and, therefore, the issue is forfeited. See Blair, 215 Ill. 2d at 443-44 (defining "forfeit" to mean issues that could have been raised, but were not, and are therefore barred), citing Rogers, 197 Ill. 2d at 221.

Forfeiture notwithstanding, this court may review alleged errors not properly preserved when (1) the evidence in a criminal case is closely balanced, or (2) the error is so fundamental, and of such

magnitude, that the accused is denied the right to a fair trial. Hudson, 228 Ill. 2d at 191, citing Johnson, 208 Ill. 2d at 64. However, before we determine if there was plain error, we must first determine if an error was committed by the trial court. Hudson, 228 Ill. 2d at 191, citing Urdiales, 225 Ill. 2d at 415.

On May 20, 2004, the State filed a motion for a restraining order and requested that the court enter a retraining order against codefendants Tishel, Lubenskiy, Gutman and UPT to prevent them from disposing of or otherwise dissipating any monies, profits or proceeds, and any interest or property THAT was acquired or maintained as a result of committing the offense of vendor fraud. The motion listed six properties: (1) paragraph 12 of the motion discussed 13825 Lucky Lake Drive, Lake Forest, Illinois; (2) paragraph 13 of the motion discussed 4606 West Fargo, Skokie, Illinois; (3) paragraph 14 of the motion discussed 3124 West North Shore, Chicago, Illinois; (4) paragraph 15 of the motion discussed 1128 Amelia Court, Indian Creek, Illinois; (5) paragraph 16 of the motion discussed 33 West Ontario, Unit 31A, Chicago, Illinois; and (6) paragraph 17 of the motion discussed 33 West Ontario United 30A, Chicago, Illinois. The motion was supported by, among other things, checks and deposit tickets.

With regard to paragraph 12 of the motion, discussing the property located at 13825 Lucky Lake Drive, Lake Forest, Illinois, the motion alleged that the following transactions occurred: (1) UPT wrote a $300,000 check payable to Tishel; (2) Tishel deposited the check into his personal account; (3) Tishel wrote two $150,000 checks from his personal account payable to "Y Gutman"[4];

---

[4]Lubenskiy testified that Gutman's son is Yuri Gutman.

(4) Y Gutman deposited one of the checks into an account which listed Ezra Entertainment as the owner of the account and Gutman and Lubenskiy as co-signors of the account; (5) a $295,000 cashier's check was drawn from Ezra Entertainment's account and made payable to Lubenskiy; and (6) on October 25, 2001, Lubenskiy purchased the Lake Forest property for $295,000.

At trial, Lubenskiy testified as follows:

"Q. [The State] How was money transferred to Erit [*sic*] Gutman?

A. Money was issued from Universal Public Transportation business account to Mike Tishedel [*sic*] personal account, and from Mike Tishdel [*sic*] First National account to Erit [*sic*] Gutman personal account.

Q. How were you supposed to get money from Universal?

A. Money which was issued to Erit [*sic*] Gutman account, part of it is supposed to be mine.

Q. Did you ever get money from her during this time?

A. No.

Q. What was the money transferred to Erit [*sic*] Gutman's account used for?

A. To buy real estate property.

&#42;&#42;&#42;

Q. Where was the property located?

A. Single-family house in Fox River; single-family house in Chicago,

Pratt and Kedzie; two single-family houses on Indian Creek in Vernon Hills.

***

Q. Do you know in whose names these houses were bought?

A. Yes, in Erit [*sic*] Gutman's name.

Q. What, if anything, did you expect to receive with regard to these property [*sic*]?

A. Half.

Q. Did you receive half?

A. No."

We note, before we review Lubenskiy's testimony, that due process concerns are implicated when a conviction is obtained through the use of false testimony and the conviction is subject to reversal. People v. Lucas, 203 Ill. 2d 410, 422 (2003), citing Giglio v. United States, 405 U.S. 150, 153-54, 31 L. Ed. 2d 104, 108, 92 S. Ct. 763, 766 (1972); People v. Coleman, 183 Ill. 2d 366, 391 (1998). Therefore, where the State's case includes perjured testimony of which the State was aware, this court must overturn the conviction " 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " Lucas, 203 Ill. 2d at 422, quoting Coleman, 183 Ill. 2d at 392, citing United States v. Agurs, 427 U.S. 97, 103, 49 L. Ed. 2d 342, 349-50, 96 S. Ct. 2392, 2397 (1976).

First, Gutman contends that paragraph 12 in the State's motion for a restraining order contradicts Lubenskiy's testimony at trial. We find that paragraph 12 of the motion for a restraining

order alleged that Lubenskiy purchased the property located at 13825 Lucky Lake Drive, Lake Forest, Illinois, with a $295,000 cashier's check from UPT. At trial, Lubenskiy denied receiving monies from the following properties: a single-family home in Fox River, a single-family home in Chicago, and two single-family homes in Vernon Hills. We find that paragraph 12 of the State's motion for a restraining order concerned a property located in Lake Forest, Illinois, while Lubenskiy's testimony at trial concerned (1) a single-family home in Fox River, (2) a single-family home in Chicago, and (3) two single-family homes in Vernon Hills. We find that Lubenskiy did not testify at trial about the Lake Forest property referenced in the motion for a restraining order. Therefore, because Lubenskiy's trial testimony did not contradict the statements set forth in the motion for a restraining order, we find that the State did not knowingly allow perjured testimony to stand uncorrected. See Lucas, 203 Ill. 2d at 422.[5]

Second, Gutman contends that the documentary evidence that supported the State's motion for a restraining order establishes that Lubenskiy obtained the deed or ownership in the following properties: (1) 13825 Lucky Lake Drive, Lake Forest, Illinois; (2) 4606 West Fargo, Skokie, Illinois; and (3) 33 West Ontario, Unit 31A, Chicago, Illinois. Gutman further contends that the above-referenced documentary evidence contradicts Lubenskiy's testimony at trial. We find that the State

---

[5]Regarding Gutman's argument that Lubenskiy's trial testimony indicated that he did not receive any money from Gutman's account, we find that, when read in context, Lubenskiy's trial testimony referred to money transferred to Gutman's account which was in turn used to purchase the four properties specifically referred to in Lubenskiy's trial testimony.

presented documentary evidence relating to the following properties: (1) 13825 Lucky Lake Drive, Lake Forest, Illinois; (2) 4606 West Fargo, Skokie, Illinois; and (3) 33 West Ontario, Unit 31A, Chicago, Illinois. We further find that Lubenskiy testified that he was supposed to own half of the following properties: (1) a single-family house in Fox River, (2) a single-family house in Chicago near Pratt and Kedzie, and (3) two single-family houses on Indian Creek in Vernon Hills. We find that the documentary evidence attached to the State's motion for a restraining order concerned properties that were separate and distinct from the properties Lubenskiy testified about at trial. Therefore, because Lubenskiy's trial testimony did not contradict the statements set forth in the motion for a restraining order, we find that the State did not knowingly allow perjured testimony to stand uncorrected. See Lucas, 203 Ill. 2d at 422. Accordingly, because there was no perjured testimony, the trial court did not err when it admitted Lubenskiy's testimony and, without an error, there can be no plain error. Hudson, 228 Ill. 2d at 191, citing Urdiales, 225 Ill. 2d at 415.

Ineffective Assistance of Counsel

Next, Gutman contends that trial counsel was ineffective: (1) for failing to impeach Lubenskiy with his false testimony, and (2) for failing to argue in her posttrial motion (a) that the State knowingly used false testimony, and (b) that the trial court erroneously allowed the State to introduce into evidence Lubenskiy's agreement with the federal government barring him from participating in the medicare system.[6]

---

[6]Gutman also argued that trial counsel was ineffective (1) for failing to file a pretrial motion to dismiss the money laundering indictment, and (2) for failing to argue in her posttrial

The law of ineffective assistance of counsel is well established. A criminal defendant is constitutionally entitled to receive " 'reasonably effective' " assistance of counsel, such that courts uniformly hold that an attorney's conduct must not render the trial results undependable. People v. Irvine, 379 Ill. App. 3d 116, 128-29 (2008), quoting People v. Cunningham, 376 Ill. App. 3d 298, 301 (2007), quoting Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). We note that Strickland, the seminal United States Supreme Court case on the issue of the ineffective assistance of counsel, has been adopted by the Illinois Supreme Court. People v. Albanese, 104 Ill. 2d 504, 526 (1984).

Under Strickland, an ineffective assistance claim requires a showing (1) that trial counsel's performance was so deficient that it fell below an objective standard of reasonableness (deficiency prong), and (2) that trial counsel's deficient performance so prejudiced the defendant that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different (prejudice prong). Irvine, 379 Ill. App. 3d at 129, quoting People v. Houston, 226 Ill. 2d 135, 144 (2007), citing People v. Evans, 209 Ill. 2d 194, 219-20 (2004), and People v. Peeples, 205 Ill. 2d 480, 512-13 (2002).

With regard to the deficiency prong of the Strickland test, a defendant must overcome a

---

motion that the money laundering indictment was insufficient. However, for the reasons stated above, this court has vacated Gutman's money laundering conviction. Therefore, we need not address Gutman's claims of ineffective assistance of counsel relating to her vacated money laundering conviction.

strong presumption that, under the circumstances, counsel's conduct might be considered sound trial strategy. Irvine, 379 Ill. App. 3d at 129, quoting Houston, 226 Ill. 2d at 144, citing Peeples, 205 Ill. 2d at 512. The tactical decisions of trial counsel are afforded wide latitude and are virtually unchallengeable " 'because such a choice "is a matter of professional judgment to which a review of counsel's competency does not extend." ' " Irvine, 379 Ill. App. 3d at 129, quoting Cunningham, 376 Ill. App. 3d at 301, quoting People v. Cundiff, 322 Ill. App. 3d 426, 435 (2001), and citing Strickland, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.

Under the prejudice prong of the Strickland test, a reasonable probability that the result would have been different is a probability that undermines confidence in the outcome. Irvine, 379 Ill. App. 3d at 129, citing Houston, 226 Ill. 2d at 144, citing Evans, 209 Ill. 2d at 220, and Peeples, 205 Ill. 2d at 513. Although a defendant must satisfy both the deficiency prong and the prejudice prong of the Strickland test (Houston, 226 Ill. 2d at 144-45), this court is permitted to review either prong first and need not review both prongs if the defendant fails to show either prong. Irvine, 379 Ill. App. 3d at 129-30, quoting Cunningham, 376 Ill. App. 3d at 301, citing Strickland, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

First, Gutman contends counsel was ineffective for failing to impeach Lubenskiy with his alleged false testimony and that counsel was ineffective for failing to include this issue in a posttrial motion. However, for the reasons stated above, we found that Lubenskiy's testimony was not false. Therefore, we find that trial counsel was not ineffective for failing to impeach Lubenskiy, or raise the issue in a posttrial motion, where no error occurred.

Second, Gutman contends that trial counsel was ineffective for failing to file a posttrial

motion and that the trial court erred when it allowed the State to introduce into evidence Lubenskiy's agreement with the federal government barring him from participating in the medicare program. Gutman also argues that trial counsel was ineffective for failing to argue in her posttrial motion that the trial court erred when it admitted group exhibit 147. Specifically, Gutman argues that the court erred because (1) there is no dispute that Lubenskiy's confirmation did not mention Gutman, and (2) Lubenskiy may have had an interest in not telling Gutman of the confirmation. Therefore, Gutman argues that the trial court should not have assumed that Gutman knew of Lubenskiy's confirmation.[7]

As noted above, under Strickland, a claim of ineffective assistance of counsel requires a showing that trial counsel's deficient performance fell below an objective standard of reasonableness and the deficient performance so prejudiced the defendant that there is a reasonable probability that the result of the proceeding would have been different. Irvine, 379 Ill. App. 3d at 129, quoting Houston, 226 Ill. 2d at 144, citing Evans, 209 Ill. 2d at 219-20, and Peeples, 205 Ill. 2d at 512-13; see also Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. In the instant case, the record establishes that the trial court admitted, without objection, exhibit 129, which was the 1999

---

[7]Gutman also argued in his brief that, even if Gutman entered into a settlement agreement in which she agreed to no longer participate in the medical assistance program, there is no indication that the ban was immediate. However, Lubenskiy read into the record that portion of exhibit 129 which established that Gutman agreed to be barred from Medicaid, all federal health care programs, and the Illinois Medical Assistance Program, "on the effective date of this agreement."

federal agreement barring Lubenskiy and Gutman from the Medicaid program. Exhibit 129 established that Gutman was barred from participating in the Medicaid program. We find that Gutman was not prejudiced by the admission of group exhibit 147 because the evidence that Gutman complains about on appeal - evidence that Gutman was on notice that she was not to be involved with UPT - was already in evidence because exhibit 129 had previously been admitted into evidence. Therefore, because Gutman was not prejudiced by the admission of group exhibit 147, we hold that counsel was not ineffective for failing to include the issue in the posttrial motion. Irvine, 379 Ill. App. 3d at 129, quoting Houston, 226 Ill. 2d at 144, citing Evans, 209 Ill. 2d at 219-20, and Peeples, 205 Ill. 2d at 512-13; see also Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

## Sufficiency of the Evidence

Finally, Gutman contends that the State failed to prove her guilty beyond a reasonable doubt of vendor fraud involving $10,000 or more and theft of property exceeding $100,000.[8] Specifically, Gutman contends that the State failed to prove the monetary amount to sustain the convictions and sentences beyond a reasonable doubt.

A reviewing court, when assessing whether the evidence was sufficient to sustain a verdict, must determine " ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond

---

[8]Gutman also contends that the State failed to prove her guilty beyond a reasonable doubt of money laundering. However, we need not decide this issue because we vacated Gutman's conviction for money laundering.

a reasonable doubt." (Emphasis in original.)' " People v. Cardamone, 232 Ill. 2d 504, 511 (2009), quoting People v. Bush, 214 Ill. 2d 318, 326 (2005), quoting Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788 (1979); People v. Collins, 106 Ill. 2d 237, 261 (1985). " '[A] reviewing court must allow all reasonable inferences from the record in favor of the prosecution.' " Cardamone, 232 Ill. 2d at 511, quoting Bush, 214 Ill. 2d at 326, citing People v. Cunningham, 212 Ill. 2d 274, 280 (2004). This court will not substitute its judgment for that of the trier of fact. People v. Sutherland, 223 Ill. 2d 187, 242 (2006), citing People v. Collins, 214 Ill. 2d 206, 217 (2005). The trier of fact is responsible for determining the weight to be given to the witnesses' testimony, determining the witnesses' credibility, resolving conflicts in the evidence, and drawing reasonable inferences from the testimony. Sutherland, 223 Ill. 2d at 242, citing People v. Milka, 211 Ill. 2d 150, 178 (2004), and People v. Evans, 209 Ill. 2d 194, 211 (2004).

## Vendor Fraud

To prove a defendant guilty of vendor fraud, the State must establish that the defendant "willfully, by means of a false statement or representation, or by concealment of any material fact or by other fraudulent scheme or device on behalf of himself or others, obtain[ed] or attempt[ed] to obtain benefits or payments under this Code to which he or it is not entitled, or in a greater amount than that to which he or it is entitled." 305 ILCS 5/8A-3(a) (West 2000). In the instant case, the vendor fraud indictment alleged that Gutman caused the State of Illinois to authorize payments to UPT of at least $10,000 more than UPT or Gutman were entitled to be paid.

In the instant case, Rodriguez testified that, with regard to the billings for the prior approval numbers, $67,798.18 of the $71,280.40 UPT billed the State of Illinois were false billings.

Rodriguez further testified that, with regard to mileage, UPT overbilled the State of Illinois by $176,336.25. Helms testified that, from January 1, 2001, until February 28, 2002, the State of Illinois paid UPT $2,966,187.38.[9] Similarly, Lubenskiy testified that UPT received approximately $3 million from the State of Illinois. Therefore, viewing the evidence in the light most favorable to the prosecution, we hold that a rational trier of fact could have found that Gutman, a *de facto* officer of UPT, was guilty of vendor fraud because Gutman caused UPT to receive payments from the State of Illinois to which UPT was not entitled or to obtain at least $10,000 to which UPT should not have been paid. See Cardamone, 232 Ill. 2d at 511, quoting Bush, 214 Ill. 2d at 326, quoting Jackson, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2788; Collins, 106 Ill. 2d at 261.

Theft

To prove a defendant guilty of theft, the State must establish that the defendant obtained or exerted unauthorized control over property of the owner and intended to deprive the owner

---

[9]We note that the money laundering statute is violated when a person engages in a financial transaction with property derived from proceeds while violating the Criminal Code. 720 ILCS 5/29B-1(a), (b)(4) (West 2000). Conversely, the vendor fraud statute is violated when a person obtains benefits or payments to which he is not entitled or in an amount greater than that to which he is entitled. 305 ILCS 5/8A-3 (West 2000). Therefore, since the "proceeds" or "profits" Gutman derived from her financial transactions with the State do not have to be proved to establish a violation of the vendor fraud statute, this court can use UPT's receipts of $2.9 million to determine if Gutman violated the vendor fraud statute. 305 ILCS 5/8A-3 (West 2000).

permanently of the use or benefit of the property. 720 ILCS 5/16-1(a)(1)(A) (West 2000). In the instant case, the theft indictment alleged that Gutman exercised unauthorized control over more than $100,000 in State funds.

As noted above, in the instant case, Rodriguez testified that, with regard to the billings for the prior approval numbers, $67,798.18 of the $71,280.40 UPT billed the State of Illinois were false billings. Rodriguez further testified that, with regard to mileage, UPT overbilled the State of Illinois by $176,336.25. Helms testified that, from January 1, 2001, until February 28, 2002, the State of Illinois paid UPT $2,966,187.38.[10] Similarly, Lubenskiy testified that UPT received approximately $3 million from the State of Illinois.

Gutman argues that the $2,966,187.38 figure relied on by Helms "represents the total amount paid and does not take into consideration factors which would substantially reduce the amount of

[10]We note that, unlike the offense of money laundering where the State has to prove the defendant obtained proceeds or "profits" from violating the Criminal Code (720 ILCS 5/29B-1(a), (b)(4) (West 2000)), the offense of theft merely requires proof that the defendant obtained unauthorized control over property of the owner with an intention to deprive the owner permanently of the use or benefit of the property (720 ILCS 5/16-1(a)(1)(A) (West 2000)). Therefore, since the "proceeds" or "profits" Gutman derived from her financial transactions with the State do not have to be proved to establish a violation of the theft statute, this court can use UPT's receipts of $2.9 million to determine if Gutman violated the theft statute. 305 ILCS 5/8A-3 (West 2000).

actual damages." Gutman notes that Helms testified that UPT could have been the designated payee for accounts receivable from Ezra, Purple Heart, or A.K. Gutman further notes that Lubenskiy testified that some of the funds received by UPT, between $300,000 and $400,000, came from billings submitted by other companies. Gutman also argues that there were legitimate trips that occurred while UPT was in business that there was overhead that had to be paid, and that clerical mistakes could have occurred.

We find that Rodriguez testified exclusively about UPT's overbillings and did not testify about other businesses' billings. Additionally, we find that Amzaleg testified that Lubenskiy told Amzaleg that if the business was run legitimately, there would be a 20% to 25% decrease in income. We further find that, even if this court were to reduce UPT's receipts of $2.9 million by 25% and subtract an additional $400,000 in billings by other companies, UPT's receipts would still exceed the $100,000 in State funds that UPT and Gutman were alleged to have taken. Moreover, we find that the trial court heard testimony regarding UPT's alleged legitimate trips with recipients and the possibility of clerical errors. The trier of fact is responsible for determining the weight to be given to the witnesses' testimony, determining the witnesses' credibility, resolving conflicts in the evidence, and drawing reasonable inferences from the testimony. Sutherland, 223 Ill. 2d at 242, citing Milka, 211 Ill. 2d at 178, and Evans, 209 Ill. 2d at 211. Accordingly, when viewing the evidence in the light most favorable to the prosecution, we hold that a rational trier of fact could have found Gutman was guilty of theft because she, a *de facto* officer of UPT, caused UPT to exercise unauthorized control over $100,000 of the State of Illinois's money. Cardamone, 232 Ill. 2d at 511, quoting Bush, 214 Ill. 2d at 326, quoting Jackson, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at

1-08-1379

2788; <u>Collins</u>, 106 Ill. 2d at 261.

CONCLUSION

In light of the fact the trial court erred when it used evidence of UPT's receipts for transactions with the State of Illinois rather than profits to find Gutman guilty of money laundering, we vacate Gutman's money laundering conviction. We find that the evidence was sufficient to convict Gutman of money laundering, but a new trial is required to correct the trial court's error of assessing the evidence on the money laundering charge. <u>People v. Davis</u>, 377 Ill. App. 3d 735, 747 (2007), citing <u>People v. Taylor</u>, 76 Ill. 2d 289, 309 (1979). Accordingly, for the reasons stated above, we affirm Gutman's convictions for theft and vendor fraud, but remand this matter to the trial court for a new trial on money laundering and for resentencing.

Affirmed in part and vacated in part; cause remanded for further proceedings consistent with this opinion.

O'BRIEN, J., and GALLAGHER, J., concur.